Steven RILEY, Respondent,

Office of Administrative Hearings,
Respondent,

v.

Stephen JANKOWSKI, et al., Relators,

Leonard Jankowski, Respondent Below.

No. A05–1125.

Court of Appeals of Minnesota.

April 26, 2006.

Alain M. Baudry, Morgan L. Holcomb, Maslon Edelman Borman & Brand, L.L.P., Minneapolis, MN, for respondent Steven Riley.

Mike Hatch, Attorney General, Kenneth E. Raschke, Jr., Assistant Attorney General, St. Paul, MN, for respondent Office of Administrative Hearings.

Erick G. Kaardal, William F. Mohrman, Mohrman & Kaardal, P.A., Minneapolis, MN, for relators Stephen Jankowski, et al.

Considered and decided by PETERSON, Presiding Judge; SHUMAKER, Judge; and HUDSON, Judge.

## OPINION

PETERSON, Judge.

In this proceeding arising out of a complaint about the content of certain campaign material, relators challenge the determination of respondent Office of Administrative Hearings (OAH) that relators violated Minn.Stat. §§ 211B.04 and .06 (2004) and must pay civil penalties. Relators argue that (1) the administrative-hearing process established by Minn.Stat. §§ 211B.31 to .37 (2004) (a) violates the separation-of-powers doctrine, (b) violates relators' constitutional right to trial by jury, and (c) unconstitutionally intrudes on relators' First Amendment rights; (2) respondent Steven Riley lacked standing to file a complaint under Minn.Stat. § 211B.32; (3) the panel of administrative-law judges that heard Riley's complaint erred in finding that relators violated Minn.Stat. § 211B.06, subd. 1; and (4) the disclaimer requirement of Minn.

Stat. § 211B.04 is an unconstitutional restriction on relators' First Amendment rights. We reverse.

## FACTS

The City of Greenfield is governed by a five-member council consisting of the mayor and four council members. Thomas Swanson was elected mayor in November 1994 and reelected every two years thereafter until he was defeated by relator Lawrence Plack in the November 2004 election. Cindy Sykes was appointed to the city council in 1995, elected to the council in 1996, and reelected in 2000. Roger Mattila was elected to the council in November 2000. In November 2004, Sykes and Mattila lost their reelection bids to Leonard Jankowski and Sylvia Walsh.

The City of Greenfield bought about 17 acres of property, known as the "Siwek property," and built a wastewater-treatment plant on part of the property. The city council then decided to sell the remaining property without the assistance of a real-estate agent. On the advice of city attorney Jeffrey Carson, the council arranged to have the property appraised. An appraisal company valued the property at $592,111, excluding special assessments, and $932,000, including special assessments for roads, water, and sewer.

At a June 2003 council meeting, the council instructed city staff to put a sign on the property indicating that it was for sale and to also advertise the property on the city's website. But no "for sale" sign was ever placed on the property. Instead, the property was advertised only via a link on the city's website.

Swanson sought Carson's advice about whether Swanson could legally and ethically bid on the Siwek property. Carson advised Swanson that as long as he recused himself from participating in any decision-making and voting on the sale in his capacity as mayor, he could pursue a bid. At a July 2003 council meeting, Swanson informed the council that he was interested in buying part of the Siwek property and that he would be putting together a bid proposal. Swanson submitted two undated letters to Carson, informing Carson that he would like to purchase two lots of the Siwek property and detailing his proposal. Swanson offered to pay $315,000 for the lots, which included $190,348 for the land and $124,652 to assume the special assessments. The appraised value of the two lots was $343,000, including special assessments.

Mattila also expressed an interest in the Siwek property. Like Swanson, Mattila sought Carson's advice about whether he could legally and ethically bid on the property. Carson advised Mattila as he had advised Swanson.

By the December 16, 2003 council meeting, the city had received four or five letters of interest regarding the property, including Swanson's letter. Mattila did not submit a letter of interest. Carson recommended that the council authorize city staff to begin negotiations with the interested parties. At the December 16 council meeting, Carson disclosed that Swanson was interested in the property and that Mattila had made an oral inquiry about it. Carson explained to the council that neither Swanson nor Mattila could vote once purchase agreements were created and recommended. When the issue of the Siwek property came up, Swanson asked Carson whether he should "step down" on the issue. Carson stated that he did not think there would be a conflict if Swanson participated in authorizing city staff to begin negotiations on the Siwek property. Nevertheless, Swanson recused himself from participating in the decision to authorize city staff to begin negotiations on the Siwek property. Mattila also re-

cused himself, and both Swanson and Mattila left the room.

Earlier in the year, Swanson had appointed Sykes as acting mayor, which authorized her to perform the mayor's duties in the event of his absence. As acting mayor, Sykes took over running the December 16, 2003 council meeting when Swanson recused himself. After discussing the appraisals, on Carson's recommendation, the council voted to authorize two city employees to begin negotiations with interested parties. Carson sent information packets to all of the parties who had expressed an interest in the Siwek property, stating that the city would accept bids on the Siwek property until January 27, 2004.

Plack, who was a member of the Greenfield City Planning Commission and had run unsuccessfully for mayor in 2000, was present at the December 16, 2003 council meeting. Plack became outraged when he learned that Swanson and Mattila were considering bidding on the Siwek property. The next day, Plack drove by the Siwek property and saw that there was no "for sale" sign on it. Plack also called the state auditor's office and spoke with attorney David Kenney, who told Plack that the sale of city-owned property to the mayor or a council member would be illegal.

In January 2004, Kenney contacted Carson and advised him that it was the position of the state auditor's office, as well as the attorney general's office and the League of Minnesota Cities, that cities could not sell land to the mayor or council members. Kenney faxed Carson information from a League of Minnesota Cities handbook regarding the sale of land to interested city officers. By letter dated January 22, 2004, Carson informed Swanson and Mattila about what he had learned from Kenney and advised them not to bid on the Siwek property. Swanson and Mattila took no further action with respect to bidding on the Siwek property, and the city never entered into negotiations with either Swanson or Mattila for the purchase of the property.

The city received three sealed bids on the Siwek property, none of which included special assessments. Neither Swanson nor Mattila submitted a bid. At the February 3, 2004 city council meeting, the council rejected all three bids as too low and decided to hire a realtor to market the property.

Because they were frustrated by what they perceived as arrogance and a lack of communication by the city council and dissatisfied about a city ordinance governing the use of all-terrain vehicles, Plack and another Greenfield resident, James Stewart, formed a group called "Greenfield Awareness." Greenfield Awareness disseminated information stating that its goal was to bring "accountability, respect and communication" back to city government. More than 100 people attended Greenfield Awareness's first public meeting on February 9, 2004. At the meeting, Plack discussed Swanson's and Mattila's "attempts" to buy the Siwek property. After the meeting, Mattila approached Plack and said that he thought that what Plack had said at the meeting was false and irresponsible. Plack said that he would apologize for his mischaracterization of Mattila at the next Greenfield Awareness meeting, but he did not do so. At a city council meeting on February 17, 2004, Mattila clarified that he had only orally expressed an interest in the Siwek property and that he had never submitted a bid on any of the lots.

Plack filed to run for mayor in the November 2004 election. In a position statement issued as part of his mayoral campaign, Plack encouraged voters to vote for him for mayor and Leonard Jankowski and

Walsh for city council. In October 2004, Plack compiled a campaign mailing to send to all Greenfield residents except Swanson and the other city-council members. The mailing consisted of a cover letter drafted by Plack and the following documents: (1) minutes of the December 16, 2003 city-council meeting regarding Carson's recommendation to authorize city employees to enter into negotiations with parties interested in purchasing the Siwek property; (2) the undated letter from Swanson to Carson regarding Swanson's request to purchase city-owned land; (3) an appraisal of the Siwek property; (4) a letter from Kenney to the Greenfield city clerk notifying her about the complaint received regarding the sale of city-owned property; and (5) the letter from Carson to Swanson and Mattila advising them not to bid on the Siwek property.

The cover letter included in the mailing described Swanson's and Mattila's interest in the Siwek property and the city council's decision at its December 16, 2003 meeting to authorize city staff to begin negotiations with interested parties. The final paragraph of the letter stated:

> Why should you vote for Tom Swanson, Roger Mattila or Cindy Sykes after they attempted to illegally profit (in the case of Swanson and Mattila) or allow the profiting (in the case of Sykes) from their elected positions. Every tax payer in Greenfield should be outraged at the arrogance of this council. If re-elected, who knows what they will try to get away with next or what it could cost us.

### *Throw them out on November 2!*

Relator Stephen Jankowski, an attorney and Leonard Jankowski's son, reviewed the cover letter, approved its contents, and agreed to have the material sent out under his name. The campaign material did not contain a disclaimer, but the envelope had a sticker on it stating, "This publication is not circulated on behalf of any candidate or ballot question." The packet was delivered to Greenfield households about four days before the election.

Riley filed a complaint with the OAH alleging that Stephen Jankowski and Leonard Jankowski violated Minn.Stat. § 211B.06 (2004) by preparing and disseminating false campaign material. Riley filed two additional complaints alleging that Plack and Walsh violated Minn.Stat. § 211B.06 by disseminating false campaign material. An administrative-law judge (ALJ) determined that all four claims stated prima facie violations of Minn.Stat. § 211B.06, and the chief ALJ ordered that the four claims be joined for disposition under Minn.Stat. § 211B.33, subd. 4 (2004). A panel of ALJs granted Walsh's motion to dismiss the claim against her and granted Riley's motion to add claims against relators and Leonard Jankowski for failing to have a proper disclaimer on the campaign material as required by Minn.Stat. § 211B.04 (2004).

Following a two-day evidentiary hearing on the complaints, a panel of ALJs issued an order that dismissed the claims against Leonard Jankowski; found that relators had violated Minn.Stat. §§ 211B.04 and .06; ordered relators to each pay civil penalties of $2,400 for violating Minn.Stat. § 211B.06 and $600 for violating Minn. Stat. § 211B.04; and referred the matter to the Hennepin County Attorney's Office for further consideration pursuant to Minn.Stat. § 211B.35, subd. 2 (2004). This certiorari appeal follows.

### ISSUES

I. Does the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 (2004) violate the separation-of-powers doctrine expressed in arti-

cle III, section 1, of the Minnesota Constitution?

II. Were relators' rights to trial by jury violated in the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37?

III. Were relators' First Amendment rights violated in the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37?

IV. Did respondent Riley lack standing to file a complaint under Minn.Stat. § 211B.32?

V. Did the ALJ panel that heard respondent Riley's complaint err in finding that relators violated Minn.Stat. § 211B.06, subd. 1 (2004)?

VI. Is the disclaimer requirement of Minn.Stat. § 211B.04 (2004) an unconstitutional restriction on relators' First Amendment rights?

## ANALYSIS

Relators argue that the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 (2004) violates the separation-of-powers doctrine expressed in article III, section 1, of the Minnesota Constitution.

We review a statute's constitutionality de novo. We presume statutes to be constitutional and exercise the power to declare a statute unconstitutional with extreme caution and only when absolutely necessary. The party challenging the constitutionality of the statute bears the burden of establishing beyond a reasonable doubt that the statute violates a constitutional right.

*ILHC of Eagan, L.L.C. v. County of Dakota,* 693 N.W.2d 412, 421 (Minn.2005) (quotations and citations omitted).

In the hearing process, the OAH, an executive-branch agency, considers complaints alleging violations of Minn.Stat. §§ 211A.01 to .14 (2004), which establish financial-reporting requirements for political candidates and committees acting to influence the election of political candidates or to promote or defeat a ballot question, and Minn.Stat. §§ 211B.01 to .21 (2004), which regulate campaign practices. To initiate the hearing process, "[a] complaint alleging a violation of chapter 211A or 211B must be filed with the [OAH]." Minn.Stat. § 211B.32, subd. 1. If an expedited probable-cause hearing is not required,[1] the ALJ assigned to review the complaint must hold a probable-cause hearing on the complaint not later than 30 days after receiving the assignment. Minn.Stat. § 211B.34, subd. 1. If the ALJ determines that "[t]here is probable cause to believe that the violation of law alleged in the complaint has occurred . . . the chief administrative law judge must schedule the complaint for an evidentiary hearing under section 211B.35." Minn.Stat. § 211B.34, subd. 2(b). An evidentiary hearing under section 211B.35 is a hearing before a panel of three ALJs. Minn.Stat. § 211B.35, subd. 1.

The panel must determine whether the violation alleged in the complaint occurred and must make at least one of the following dispositions:

(a) The panel may dismiss the complaint.

(b) The panel may issue a reprimand.

(c) The panel may find that a statement made in a paid advertisement or

---

1. Circumstances under which an expedited probable-cause hearing is required are set forth in Minn.Stat. § 211B.33, subd. 2(b) and

(c). There is no claim that an expedited probable-cause hearing was required in this case

campaign material violated section 211B.06.

(d) The panel may impose a civil penalty of up to $5,000 for any violation of chapter 211A or 211B.

(e) The panel may refer the complaint to the appropriate county attorney.

*Id.*, subd. 2.

A party aggrieved by a final decision on a complaint ... is entitled to judicial review of the decision as provided in sections 14.63 to 14.69; however, proceedings on a complaint ... are not a contested case within the meaning of chapter 14 and are not otherwise governed by chapter 14.

Minn.Stat. § 211B.36, subd. 5.

## I.

Relators contend that the authority exercised by the OAH in the hearing process is different from the authority exercised by the OAH in other administrative proceedings because the hearing process does not involve an administrative agency that regulates or oversees campaign practices. Instead, the OAH considers individual complaints alleging statutory violations, finds facts and determines whether statutory provisions have been violated, and issues final decisions regarding the complaints. Relators contend that as a matter of constitutional law, the inherently judicial functions of hearing and deciding charges alleging violations of chapters 211A and 211B cannot be delegated to an agency in the executive branch of state government.

Minnesota Constitution article III, section 1 states:

The powers of government shall be divided into three distinct departments: legislative, executive and judicial. No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this Constitution.

The Minnesota Supreme Court has explained the limits of legislative authority to delegate quasi-judicial power to the executive branch of state government. In *Breimhorst v. Beckman,* 227 Minn. 409, 35 N.W.2d 719 (1949), which involved an action brought by an injured employee against her employer, the supreme court considered whether the legislature's delegation of quasi-judicial powers to the industrial commission, an administrative body, violated article III, section 1, of the state constitution. The powers delegated to the commission included the power to determine facts and apply the law to the facts in employment-accident controversies. *Id.* at 433, 35 N.W.2d at 734. The supreme court explained:

These powers of determination do not partake of the finality of an adjudication, in that the commission is without final authority to decide and render an enforceable judgment, which is the essence of the judicial power. [The commission's] awards and determinations are not enforceable by execution or other process until a binding judgment is entered thereon by a regularly constituted court. Administrative or quasi-judicial determinations which are merely preparatory to an order or judgment to be rendered by a court cannot be properly termed judicial. In addition, the legislature not only denied an enforceable finality to the commission's powers of factual determination, but also made their exercise subordinate to the judiciary by providing for a review by certiorari by this court of errors of law and on the ground that the commission's findings or orders are unsupported by the evidence.... In *State ex rel. Yaple v. Creamer,* 85 Ohio St. 349, 401, 97 N.E. 602, 607, 39 L.R.A.N.S. 694 (1912), the

court observed: * * * What is judicial power cannot be brought within the ring-fence of a definition. It is undoubtedly power to hear and determine, but this is not peculiar to the judicial office. Many of the acts of administrative and executive officers involve the exercise of the same power. * * * [M]any boards hear and determine questions affecting private as well as public rights, * * *. The authority to ascertain facts and apply the law to the facts when ascertained pertains as well to other departments of government as to the judiciary.

*Id.* at 432–33, 35 N.W.2d at 733–34 (quotations and citations omitted). The supreme court held that vesting these quasi-judicial powers in the industrial commission

is not in violation of state constitutional provisions for the division of the powers of government or for the vesting of the judicial power in the courts, as long as the commission's awards and determinations are not only subject to review by certiorari, but lack judicial finality in not being enforceable by execution or other process in the absence of a binding judgment entered thereon by a duly established court.

*Id.* at 433, 35 N.W.2d at 734.

In *Wulff v. Tax Court of Appeals,* 288 N.W.2d 221, 222 (Minn.1979), the petitioners argued that the existence of the tax court as an independent agency of the executive branch of state government violated the separation-of-powers doctrine in article III, section 1, of the state constitution. In holding that the existence of the tax court did not violate the separation-of-powers doctrine, the supreme court stated:

We believe that the criteria set out in *Breimhorst* mark the outside limit of allowable quasi-judicial power in Minnesota.

That decision was mandated in great part by the important social issues presented. The critical need for a method of compensating victims of work-related accidents justified the delegation in that case. Such a pressing need is not present here.

This case presents additional problems because of the legal effect of Tax Court decisions. Unlike decisions of most administrative agencies, such as the one reviewed in *Breimhorst,* which require judicial enforcement, Tax Court decisions, upon filing, automatically become orders of the court. It is precisely this type of impingement by other branches of government on the judiciary that concerns us.

In view of the aforementioned, we are reticent to approve such a legislative scheme. There are, however, additional factors which influence our decision. One is the unique nature and history of taxation....

* * * Taxation is primarily a legislative function, and the steps taken under the authority of the legislature are administrative in character, in which judicial assistance may be invoked as a matter of convenience, because, with its assistance, the rights of parties and the interests of the public can be best protected and conserved. But the legislature might have authorized such proceedings to be conducted from beginning to end before or by administrative officers or bodies. Such functions are not judicial in the strict sense.

Recognizing that this feature of taxation does distinguish it from many other areas of present or future administrative adjudication, we have more latitude in permitting such delegation.

*Id.* at 223–24 (quotation omitted).

Citing two provisions of the state constitution, the petitioners also argued in *Wulff* that the existence of the tax court uncon-

stitutionally encroached on the jurisdiction of the district court. The statute that created the tax court provided:

> The tax court shall have statewide jurisdiction. Except for an appeal to the supreme court or any other appeal allowed under this subdivision, the tax court shall be the sole, exclusive, and final authority for the hearing and determination of all questions of law and fact arising under the tax laws of the state, as defined in this subdivision, in those cases that have been appealed to the tax court and in any case that has been transferred by the district court to the tax court.

*Id.* at 224 (quoting Minn.Stat. § 271.01, subd. 5 (Supp.1977)).[2]

Under the state constitution, "[e]very person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws." Minn. Const. art. I, § 8. The constitution also provides that "[t]he district court has original jurisdiction in all civil and criminal cases and shall have appellate jurisdiction as prescribed by law." Minn. Const. art. VI, § 3. The petitioners in *Wulff* argued that when read together, these provisions require the district court to exercise its jurisdiction in tax cases, and any statutory provision purporting to allow a transfer to the tax court must be void. 288 N.W.2d at 224. In rejecting this argument, the supreme court explained:

> By providing this power to transfer, the legislature is not encroaching on the original jurisdiction of the district court.

Because this power is discretionary, the decision to hear a case or to transfer it is entirely the court's. This legislative grant takes nothing from the district court that it does not voluntarily relinquish. At the same time, we find no violation of Minn. Const. art. 1, s 8, since an individual with a tax dispute does not go remediless. A remedy is provided by the tax court, subject to and including judicial review.

In analyzing the framework created by the tax statutes in question, it is crucial to note that the taxpayer always has the option to file in district court. This is perhaps the saving feature of this statutory scheme. Because the taxpayer has this opportunity to elect a judicial determination, because any transfer to the Tax Court is discretionary with the district court, and because there is always an ultimate check on administrative power in the form of review as of right in this court, we are satisfied that the Tax Court statute does not usurp judicial functions nor deprive taxpayers of constitutional rights. Therefore, in its present form, it is not an impermissible delegation by the legislature.

*Id.* at 224–25 (citation omitted).

More recently, in *Holmberg v. Holmberg,* 588 N.W.2d 720 (Minn.1999), the supreme court held that an administrative child-support process violated the separation-of-powers doctrine. The supreme court explained that the statute that created the administrative process gave ALJs "all powers, duties, and responsibilities conferred on judges of district court to obtain and enforce child and medical support and parentage and maintenance obligations," including the power

---

**2.** The supreme court noted that this statute was clarified by 1978 Minn. Laws ch. 672, § 1, which added a subdivision 6, which reads: "A case arising under the tax laws of this state, as defined in subdivision 5, which was pending on July 1, 1977 may be transferred to the tax court by the district court in which it was pending."

to issue subpoenas, conduct proceedings according to administrative rules in district court courtrooms, and issue warrants for failure to appear. In addition, ALJs may modify child support orders, even those granted by district courts. While ALJs cannot preside over contested parentage and contempt proceedings, they can grant stipulated contempt orders and uncontested parentage orders if custody and visitation are also uncontested.

*Id.* at 723 (quoting Minn.Stat. § 518.5511, subd. 1(e) (1996)) (citations omitted). Also, ALJ orders were "appealable to the court of appeals in the same manner as district court decisions, rather than by writ of certiorari." *Id.* at 722.

The *Holmberg* court held that the administrative child-support process violated the constitutional constraints on separation of powers for three separate and independent reasons: the administrative process infringed on the district court's original jurisdiction; ALJ jurisdiction was not inferior to the district court's jurisdiction; and the administrative process empowered nonattorneys to engage in the practice of law, "infringing on the court's exclusive power to supervise the practice of law." *Id.* at 726. The court explained: ·

> In determining if the original jurisdiction of the courts is being usurped, we look at the origins of the rights and relief, equitable or statutory, an agency oversees.... The *Wulff* court determined that the type of function delegated, judicial or legislative, plays a critical role in determining whether an administrative action impinges on the district court's original jurisdiction.

> Unlike the tax court, the administrative child support process encompasses an area of the law which arises in equity. Family dissolution remedies, including remedies in child support decisions, rely

on the district court's inherent equitable powers. Thus, cases involving family law fall within the district court's original jurisdiction. The legislature's delegation of an area of the district court's original jurisdiction calls for this court's close scrutiny.

> . . . .

> ... Minnesota's administrative child support process is mandatory for many parties, removing from the district court a class of cases that fall within its original jurisdiction. Further, under Minnesota's administrative process, ALJs are not only given powers which inherently belong to the district court, but they are placed on par with district courts in deciding child support cases. The statute explicitly grants ALJs all powers, duties, and responsibilities conferred on judges of district court to handle child support cases. Arguably, ALJs are even superior in some respects as ALJs are empowered to modify child support orders granted by district courts. Finally, ALJ child support orders are given the same deference as district court orders—they are appealable by right and reviewed by the court of appeals under an abuse of discretion standard.

> . . . .

> The indicia that the *Breimhorst* court utilized in determining whether there was adequate judicial oversight are neither exclusive nor rigid. Rather, the *Breimhorst* court's analysis points to the importance of a flexible review standard when considering whether a statute violates separation of powers. While supreme court decisions following · *Breimhorst* have relied, in part, on public policy to affirm legislatively created administrative schemes, they have also been shaped by the existence of adequate judicial checks on administrative actors, the function delegated, ALJ de-

cision appealability, voluntariness of entry into the administrative system, and whether the legislative delegation is comprehensive or piecemeal.

*Id.* at 724–25 (quotation and citations omitted).

■ a. Citing *Holmberg*, relators argue that because the complaint filed against them with the OAH alleges a violation of Minn.Stat. § 211B.06 (gross misdemeanor to intentionally participate in production or dissemination of false political advertising or campaign material), delegating adjudication of the complaint to the OAH is an unconstitutional delegation of the district court's original jurisdiction in criminal cases. But the fact that the OAH has been given authority to determine whether Minn.Stat. § 211B.06 has been violated does not mean that the proceeding before the OAH is a criminal case.

Relators' argument appears to be based on a misreading of Minn.Stat. § 211B.32, subd. 1, which requires a complaint alleging a violation of chapter 211A or 211B to be filed with the OAH and states that "[t]he complaint must be finally disposed of by the [OAH] before the alleged violation may be prosecuted by a county attorney." Relators appear to read this subdivision to mean that filing a complaint in the OAH is a necessary first step in a criminal prosecution for violating chapter 211A or 211B. But a county attorney may prosecute violations of chapter 211A and 211B. Minn.Stat. §§ 211A.08, subd. 3, 211B.16, subd. 3. And the plain language of Minn.Stat. § 211B.32, subd. 1, requires only that when a complaint has been filed, the OAH must finally dispose of the complaint before a county attorney can prosecute the same alleged violation. Nothing in the statutory language requires a county attorney to wait for a complaint to be filed before prosecuting a violation or limits a county attorney's au-

thority to prosecute an alleged violation when no complaint has been filed or after a final disposition under Minn.Stat. § 211B.35. The statute only requires that the administrative process and a criminal prosecution not occur simultaneously.

Even if we consider the language of Minn.Stat. § 211B.32, subd. 1, to be ambiguous, we conclude that the legislature did not intend the proceeding in the OAH to be a criminal proceeding because the legislature specifically provided that in a proceeding in the OAH, the standard of proof for an alleged violation of Minn.Stat. § 211B .06 is clear and convincing evidence and the standard of proof for any other alleged violations of chapter 211A or 211B is a preponderance of the evidence. Minn.Stat. § 211B.32, subd. 4. The supreme court has explained that the Due Process Clause of the United States Constitution requires that to convict a defendant of a crime, the state must prove beyond a reasonable doubt all of the elements of the offense with which the defendant is charged. *State v. Clausen,* 493 N.W.2d 113, 116 (Minn.1992). And in ascertaining the intention of the legislature, we may presume that "the legislature does not intend to violate the Constitution of the United States or of this state." Minn. Stat. § 645.17(3) (2004). Therefore, the legislature could not have intended the proceeding in the OAH to be a criminal prosecution because a criminal prosecution would require proof beyond a reasonable doubt, and the legislature explicitly required other standards of proof.

Because the proceeding in the OAH is not a criminal prosecution, delegating the adjudication of complaints filed under Minn.Stat. § 211B.32, subd. 1, to the OAH is not an unconstitutional delegation of the district court's original jurisdiction in criminal cases. A proceeding in the OAH and a criminal prosecution for any violation of

chapter 211A or 211B are separate proceedings.

b. Relators argue that Minn.Stat. §§ 211B.31 to .37 establish a court that is not inferior to the district court, in violation of Minn. Const. art. III, § 1, and Minn. Const. art. VI, § 1, and that here, as in *Holmberg*, ALJs are placed on a par with district courts in deciding whether a criminal statute has been violated.

Minnesota Constitution article VI, section 1, states, "The judicial power of the state is vested in a supreme court, a court of appeals, if established by the legislature, a district court and such other courts, judicial officers and commissioners with jurisdiction inferior to the district court as the legislature may establish."

Relators contend that the factors that the *Holmberg* court considered when determining whether the child-support administrative-review process violated the separation-of-powers doctrine included the function delegated; the appealability of ALJ decisions; the adequacy of judicial checks on administrative actors; the voluntariness of entry into the administrative system; and whether the legislative delegation was comprehensive or piecemeal. Relators argue that applying these factors to the administrative-review process established under Minn.Stat. §§ 211B.31 to .37 demonstrates that the legislature has established an adjudicative body with powers that are not inferior to the district court.

(1) Relators argue that there are no checks on the ALJ panels at the district court level and that an order from an ALJ panel has judicial finality. But relators also acknowledge that a party who is aggrieved by a final decision of an ALJ panel "is entitled to judicial review of the decision as provided in [Minn.Stat. §§ ] 14.63 to 14.69." Minn.Stat. § 211B.36, subd. 5. Minn.Stat. §§ 14 .63 to .69 (2004) provide for review of final administrative decisions in this court by writ of certiorari. The supreme court held in *Breimhorst* that vesting quasi-judicial powers in the executive branch did not violate the separation-of-powers doctrine or the constitutional requirement for vesting judicial power in the courts as long as the executive-branch decisions "are not only subject to review by certiorari, but lack judicial finality in not being enforceable by execution or other process in the absence of a binding judgment entered thereon by a duly established court." *Breimhorst*, 227 Minn. at 433, 35 N.W.2d at 734. An order from an ALJ panel is subject to review by certiorari, and relators have neither argued nor demonstrated that an order from an ALJ panel is enforceable by execution or other process in the absence of a binding judgment entered thereon by a duly established court. Because relators have not shown that either of the *Breimhorst* requirements is absent from a proceeding in the OAH, the absence of checks on the ALJ panels at the district court level is of no consequence.

(2) Relators argue that the function delegated to the ALJ panels is the power to determine whether a criminal statute has been violated and to finally dispose of a criminal case by issuing a fine, which, relators contend, is an inherently judicial function. But, as we have already discussed, the proceeding in the OAH is not a criminal proceeding, and, therefore, any disposition rendered by an ALJ panel cannot be the final disposition of a criminal case. Furthermore, one of the statutory dispositions that an ALJ panel may make is to "refer the complaint to the appropriate county attorney." Minn.Stat. § 211B.35, subd. 2(e). If the legislature had intended the disposition made by an ALJ panel to be the final disposition of a criminal case, there would be no reason for allowing the

panel to refer the complaint to a county attorney.

Also, relators' contention that an ALJ panel may dispose of a complaint by issuing fines ignores the plain language of the statute, which states, "The panel may impose a civil penalty of up to $5,000 for any violation of chapter 211A or 211B." Minn. Stat. § 211B.35, subd. 2(d). Although calling the penalty that an ALJ panel may impose a civil penalty, rather than a fine, does not, by itself, mean that a proceeding before the panel is a civil proceeding, the Minnesota Supreme Court has explained that

> [i]n determining whether an action is "criminal or civil," the intent of the legislature and the purpose of the penalty controls. *United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980). The Supreme Court has emphasized that only upon the "clearest proof" will the assessment of a penalty convert a civil action into a criminal one.

*State by Humphrey v. Alpine Air Prods., Inc.,* 500 N.W.2d 788, 792 (Minn.1993). The supreme court has also identified the following factors to be considered when determining whether a penalty converts a civil action into a criminal action:

> "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only upon a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions."

*Id.* (quoting *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 567, 9 L.Ed.2d 644 (1963) (citations omitted)). Considering these factors, we do not find the clear proof needed to persuade us that the civil penalty that an ALJ panel may impose converts the proceeding before the panel from a civil proceeding into a criminal proceeding.

The civil penalty that an ALJ panel may impose does not involve any affirmative restraint. Although paying money is a punishment, it has historically been viewed as serving nonpunitive purposes. *Alpine Air Prods.,* 500 N.W.2d at 792. Some violations of chapters 211A and 211B require a finding of scienter and some do not. Presumably, a civil penalty will deter violations of chapters 211A and 211B, but these violations are already subject to criminal penalties under Minn.Stat. §§ 211A.11 and 211B.19, and the civil penalty permitted under Minn.Stat. § 211B.35, subd. 2(d), is rationally connected to the alternative purpose of providing a range of dispositions in an expeditious proceeding for considering complaints alleging violations during the course of ongoing political campaigns, when it is unlikely that either a civil or criminal action could be completed before election day. Finally, the maximum $5,000 civil penalty does not appear excessive in relation to this purpose.

(3) Quoting two phrases from *Holmberg,* 588 N.W.2d at 726, relators contend that "the Court in *Holmberg* held that 'the right to appellate review does not provide sufficient judicial oversight ...' because 'many participants in the administrative process lack the resources to mount an appeal.'" Relators argue that the same is true here in that the typical respondent in a proceeding before the OAH "would be a political candidate who has already likely overextended himself or herself for the

campaign" and who "would be especially hard pressed to pursue an appeal." But in making this argument, relators have quoted the two phrases from *Holmberg* out of context and have misstated the basis for the holding in *Holmberg*. The two phrases that relators quoted appear in the following paragraph from *Holmberg:*

> Under the criteria by which our court has measured the constitutional validity of specific statutory schemes, the administrative child support process raises grave separation of powers concerns. With its creation of the administrative process, the legislature has delegated to an executive agency the district court's inherent equitable power. This delegation infringes on the district court's original jurisdiction. Not only are ALJs given responsibilities and powers comparable to a district court, but ALJs also have the power to modify district court decisions. Finally, although appellants encourage us to rely on the availability of appellate review to conclude that there is adequate judicial supervision of the administrative process, *the right to appellate review does not provide sufficient judicial oversight* of this mandatory, albeit piecemeal, process. We find their contention particularly troubling in this instance, as *many participants in the administrative process lack the resources to mount an appeal.*

588 N.W.2d at 725–26 (emphasis added).

When the two quoted phrases are read in the context of the entire paragraph in which they appear, it is apparent that the supreme court did not hold in *Holmberg* that the right to appellate review does not provide sufficient judicial oversight *because* many participants in the administrative process lack the resources to mount an appeal. The supreme court found multiple reasons why appellate review did not provide sufficient judicial oversight to

overcome the separation-of-powers concerns arising out of the administrative process in *Holmberg* and merely observed that the claim that appellate review was sufficient to overcome these concerns became even more troubling when many of the people who used the administrative process lacked the resources to mount an appeal to obtain even this insufficient oversight.

■ (4) Citing a concurring opinion in *Meath v. Harmful Substance Compensation Bd.,* 550 N.W.2d 275, 284 (Minn.1996) (Anderson, J., concurring), relators argue that the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 violates the separation-of-powers doctrine because a respondent to a complaint is an involuntary participant in a quasi-criminal proceeding. But involuntary participation in an administrative process does not indicate a separation-of-powers violation when a decision rendered in the administrative process is subject to judicial review.

The concurring opinion in *Meath* recognized two different circumstances under which actions taken by an administrative entity are not "judicial" acts because the actions are not final. The first circumstance was present in *Breimhorst* and *Wulff,* where the administrative actions taken were not final because judicial review was available. *Id.* The second circumstance was present in *Meath,* where the administrative action taken was not final because the administrative mechanism was entirely voluntary and the administrative entity was not the final arbiter of whether Meath was entitled to receive compensation. *Id.* Under both circumstances, the issue was whether the administrative entity's acts were "judicial" acts because the parties were bound by the entity's decision. Either the availability

of judicial review or an administrative mechanism that is entirely voluntary indicates that the parties are not bound by an administrative entity's acts; in the first case because the administrative decision is subject to judicial review, and in the second case because the administrative proceeding is voluntary and may be avoided entirely. Consequently, even though the respondent's participation in a hearing before an ALJ panel is involuntary, the decision of the panel is not a "judicial" act because the decision is subject to review by certiorari in this court.

(5) Finally, relators argue that by failing to apply the hearing process established under Minn.Stat. §§ 211B.31 to .37 to other election statutes, the legislature established a piecemeal process for enforcing election statutes. The only other election statute that relators cite is chapter 10A, Minn.Stat. §§ 10A.01 to .37 (2004), which regulates campaign finance and public disclosure of expenditures related to political activity. Section 10A.02 creates the Campaign Finance and Public Disclosure Board and grants the board authority to enforce the provisions of sections 10A.01 to .37. The authority of the board with respect to sections 10A.01 to .37 appears similar in some respects to the authority of the OAH with respect to chapters 211A and 211B, and it is not apparent why the legislature chose to grant authority for regulating campaign activity to more than one administrative entity.

But considering all of the factors that relators have cited as reasons why the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 violates the separation-of-powers doctrine, we conclude that the process is much more similar to the process in *Breimhorst*, which the supreme court concluded did not violate the separation-of-powers doctrine, than to the process that the supreme court invalidated in *Holmberg*.

The powers of the ALJs in *Holmberg* significantly exceeded the powers granted to ALJs under Minn.Stat. §§ 211B.31 to .37. As the supreme court stated in *Holmberg*, the statute that created the child-support administrative review process explicitly granted "ALJs all powers, duties, and responsibilities conferred on judges of district court to handle child support cases. Arguably, ALJs are even superior in some respects as ALJs are empowered to modify child support orders granted by district courts." *Holmberg*, 588 N.W.2d at 724–25 (quotation and citation omitted). In contrast, ALJs considering unfair-campaign-practices complaints only have authority to hear evidence and determine whether the violation alleged in the complaint occurred, and, depending on their determination, render one or more of five specific statutory dispositions. Unlike the ALJs in *Holmberg*, they cannot modify a district court decision; their decisions are not granted the same deference as a district court order on appeal; and they do not take the place of the district court in criminal proceedings to enforce the provisions of chapters 211A and 211B as the *Holmberg* ALJs did in certain child-support cases.

■ c. Relators argue that Minn.Stat. §§ 211B.31 to .37 violate the separation-of-powers doctrine by removing from the executive branch the power to decide whom to prosecute and what offenses to charge. "Under our separation of powers doctrine, the power to decide whom to prosecute and what charge to file resides with the executive branch." *Johnson v. State*, 641 N.W.2d 912, 917 (Minn.2002). Relators contend that the statute delegates executive-branch power to unelected and unaccountable citizens by permitting private citizens to commence and maintain private

prosecutions for alleged violations of the criminal law.

Like relators' argument that Minn.Stat. §§ 211B.31 to .37 usurp the district court's original jurisdiction in criminal cases, this argument appears to be based on the mistaken belief that filing a complaint in the OAH is the necessary first step in a criminal prosecution for violations of chapters 211A and 211B. As we have already explained, a proceeding in the OAH is not a criminal proceeding, and Minn.Stat. §§ 211B.31 to .37 do not alter a county attorney's authority to prosecute violations of chapters 211A and 211B. Minn.Stat. §§ 211B.31 to .37 do not permit private citizens to commence criminal prosecutions.

We conclude that relators have not met their burden of establishing beyond a reasonable doubt that the administrative-hearing process established under Minn. Stat. §§ 211B.31 to .37 violates the separation-of-powers doctrine.

## II.

■ Relators argue that their right to trial by jury was violated by the administrative hearing process established under Minn.Stat. §§ 211B.31 to .37. "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the county or district wherein the crime shall have been committed, which county or district shall have been previously ascertained by law." Minn. Const., art. I, § 6. The right to a jury trial extends "to all prosecutions for which the maximum authorized penalty is incarceration." *State v. Weltzin,* 630 N.W.2d 406, 410 (Minn.2001). Relators contend that because a violation of Minn. Stat. § 211B.06, subd. 1, is a gross misdemeanor, and a person convicted of a gross misdemeanor for which no other punishment is provided may be sentenced "to

imprisonment for not more than one year," Minn.Stat. § 609.03(2) (2004), they had a right to a jury trial on the claim that they violated Minn.Stat. § 211B.06, subd. 1. But, as we have already explained, a proceeding under Minn.Stat. §§ 211B.31 to .37 is not a criminal prosecution. Relators are not entitled to a jury trial under Minn. Const., art. I, § 6.

Relators argue that if the administrative-hearing process is a civil proceeding, they are entitled to a jury trial under Minn. Const. art. I, § 4, which states, "The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy."

■ "This provision is intended to continue, unimpaired and inviolate, the right to trial by jury as it existed in the Territory of Minnesota when our constitution was adopted in 1857." *Abraham v. County of Hennepin,* 639 N.W.2d 342, 348 (Minn. 2002). It does not apply to rights and remedies later created by the legislature. *See Hawley v. Wallace,* 137 Minn. 183, 184–87, 163 N.W. 127, 128–29 (1917) (election contest based on violation of corrupt practices act); *see also Breimhorst,* 227 Minn. at 433–34, 35 N.W.2d at 734 (workers' compensation).

Relators cite no authority that the rights and remedies provided by the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 existed when the Minnesota Constitution was adopted. Instead, they argue that the complaint against them alleged a violation of Minn. Stat. § 211B.06, which, they contend, is virtually identical with a defamation claim, and, therefore, makes the complaint a cause of action at law for which they are entitled to a jury trial. We disagree.

Minn.Stat. § 211B.06, subd. 1, states:

A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material with respect to the personal or political character or acts of a candidate, or with respect to the effect of a ballot question, that is designed or tends to elect, injure, promote, or defeat a candidate for nomination or election to a public office or to promote or defeat a ballot question, that is false, and that the person knows is false or communicates to others with reckless disregard of whether it is false.

 "In order for a statement to be considered defamatory it must be communicated to someone other than the plaintiff, it must be false, and it must tend to harm the plaintiff's reputation and to lower him in the estimation of the community." *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980). Proving a violation of Minn.Stat. § 211B.06, subd. 1, is distinguishable from a defamation action in that there is no need to prove that an alleged false statement harmed a person's reputation. Relators are not entitled to a jury trial under Minn. Const. art. I, § 4.

### III.

 Relators argue that the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 is an unconstitutional intrusion on their First Amendment rights. Citing *Brown v. Hartlage*, 456 U.S. 45, 61, 102 S.Ct. 1523, 1533, 71 L.Ed.2d 732 (1982), relators contend that the administrative process establishes a system of absolute accountability for factual misstatements. In *Brown*, the Supreme Court considered whether a county-commissioner candidate's First Amendment rights were violated by a Kentucky statute that, among other things, prohibited political candidates from promising "money or

other thing of value, either directly or indirectly, to any person in consideration of the vote . . . of that person." *Id.* at 49, 102 S.Ct. at 1527. During the course of a political campaign, the county-commissioner candidate stated that one of his first official acts would be to lower the salary of a county commissioner. Upon learning that his statement arguably violated the statute that prohibited any promise of money to any person in consideration of the person's vote, the candidate issued a statement rescinding his pledge to reduce the county-commissioner salary. *Id.* at 48, 102 S.Ct. at 1526–27. After the candidate won the election, the losing candidate filed an action alleging that the promise to lower the county-commissioner salary violated the statute and seeking to have the election declared void. *Id.* at 49, 102 S.Ct. at 1527. The Kentucky courts ultimately concluded that the candidate's statement promising to lower the county-commissioner salary was not constitutionally protected and granted the losing candidate his requested relief. *Id.* at 50–52, 102 S.Ct. at 1527–28.

The United States Supreme Court concluded that the Kentucky statute was applied to limit the candidate's speech in violation of the First Amendment and reversed the decision of the Kentucky courts. *Id.* at 62, 102 S.Ct. at 1533. In reaching this conclusion, the Supreme Court explained,

The Commonwealth of Kentucky has provided that a candidate for public office forfeits his electoral victory if he errs in announcing that he will, if elected, serve at a reduced salary. As the Kentucky courts have made clear in this case, a candidate's liability under [the statute] for such an error is absolute: His election victory must be voided even if the offending statement was made in good faith and was quickly repudiated.

The chilling effect of such absolute accountability for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns.... There has been no showing in this case that [the candidate] made the disputed statement other than in good faith and without knowledge of its falsity, or that he·made the statement with reckless disregard as to whether it was false or not. Moreover, [the candidate] retracted the statement promptly after discovering that it might have been false. Under these circumstances, nullifying [the candidate's] election victory was inconsistent with the atmosphere of robust political debate protected by the First Amendment.

*Id.* at 61–62, 102 S.Ct. at 1533.

We read the Supreme Court's use of the phrase "absolute accountability for factual misstatements" as part of the court's explanation why the Kentucky statute infringed on the candidate's First Amendment rights; we do not understand the phrase to be used in relation to any procedural requirements. Minn.Stat. §§ 211B.31 to .37 establish an administrative-hearing process for considering alleged violations of the substantive provisions of chapters 211A and 211B; they do not establish substantive law.

Relators have not met their burden of establishing beyond a reasonable doubt that the administrative-hearing process established under Minn.Stat. §§ 211B.31 to .37 is an unconstitutional intrusion on their First Amendment rights.

## IV.

■ Relators argue that Riley lacked standing to file a complaint under Minn. Stat. § 211B.32. But relators did not raise this issue before the ALJ panel. General-ly, failure to raise an issue in an administrative proceeding precludes review on appeal. *REM–Canby, Inc. v. Minn. Dept. of Human Servs.,* 494 N.W.2d 71, 76 (Minn. App.1992), *review denied* (Minn. Feb. 25, 1993). Also, relators have not cited any authority that addresses standing to seek relief in an administrative proceeding; the authorities that they have cited address standing to seek judicial relief. Relators have waived the standing issue that they raise for the first time on appeal.

## V.

■ The ALJ panel determined that relators violated Minn.Stat. § 211B.06, subd. 1, and ordered each of them to pay a $2,400 civil penalty for the violations. Relators argue that the ALJ panel's conclusion that relators violated Minn.Stat. § 211B.06, subd. 1, is based on erroneous findings that relators made a false statement and that they made the statement with actual malice.

Actual malice is a term of art; it means that the defendant acted with knowledge that the publication was false or with reckless disregard of whether it was false or not. For example, as the Supreme Court has noted, a statement may have been made with actual malice if it is fabricated by the defendant, is the product of his imagination, * * * is based wholly on an unverified anonymous telephone call [or if] the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Moreover, actual malice does not mean that the defendant acted with ill will or spite.

Notably, the standard for reckless disregard for truth is a subjective one; reckless disregard does not mean recklessness in the ordinary sense of extreme negligence. Instead, reckless disregard requires that a defendant make a

statement while subjectively believing that the statement is probably false.

*Chafoulias v. Peterson,* 668 N.W.2d 642, 654–55 (Minn.2003) (citations and quotations omitted). *Chafoulias* involved a defamation claim, and although we have already determined that a complaint filed in the OAH alleging a violation of Minn.Stat. § 211B.06, subd. 1, is not a defamation action, the plain language of Minn.Stat. § 211B.06, subd. 1, includes the definition of actual malice set forth in *Chafoulias,* and we see no reason why actual malice should be analyzed differently here than in a defamation action.

Under Minn.Stat. § 211B.06, subd. 1:

A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material with respect to the personal or political character or acts of a candidate . . . that is designed or tends to elect, injure, promote, or defeat a candidate for nomination or election to a public office . . . that is false, and that the person knows is false or communicates to others with reckless disregard of whether it is false.

■ In a hearing before an ALJ panel, the complainant bears the burden of proof, and a violation of Minn.Stat. § 211B.06 relating to false statements in campaign materials must be proved by clear and convincing evidence. Minn.Stat. § 211B.32, subd. 4. This means that to prove that relators violated Minn.Stat. § 211B.06, subd. 1, the complainant needed to prove by clear and convincing evidence that the campaign materials that relators distributed contained a statement that was false and either that relators knew that the statement was false or that they recklessly disregarded whether the statement was false.

The ALJ panel concluded that "[t]he Complainant has shown by clear and convincing evidence that the cover letter [in the materials distributed to Greenfield residents] contained a false statement, namely, that Swanson, Mattila and Sykes attempted to use their elected positions to allow Swanson and Mattila to profit illegally." The panel also found that "[t]he Complainant has shown by clear and convincing evidence that [relators] knew that no illegal conduct was committed or attempted by Swanson, Mattila and Sykes or they communicated the false statement with reckless disregard for its falsity."

In a memorandum, the panel explained its findings:

There is no evidence in the record that either Swanson or Mattila attempted to engage in illegal conduct. Instead the record established that they appropriately sought legal advice from the City Attorney and acted reasonably based on that advice. When the City Attorney's advice changed, Swanson and Mattila took no further action with respect to their interest in the Siwek property. Swanson and Mattila did not intend to do anything illegal and their preliminary inquiries regarding the property and subsequent recusal at the December 16 City Council meeting cannot properly be characterized as an attempt to engage in illegal conduct.

Respondents Plack and Stephen Jankowski were aware prior to October 2004 that neither Swanson nor Mattila submitted a bid on the Siwek property. They were also aware that the most Mattila did with respect to purchasing the Siwek lots was to orally express an interest in the property and to recuse himself from the decision to begin negotiations at the December 16, 2003 City Council meeting. Nothing in Swanson or Mattila's behavior can fairly be char-

acterized as "attempting to illegally profit from their elected positions." This is a very serious allegation. The Complainant has established by clear and convincing evidence that Respondent Plack and Stephen Jankowski knew the statement was false or at least communicated the statement with a reckless disregard of whether it was false.

Respondents Plack and Stephen Jankowski also accused Cindy Sykes of "attempting to allow the illegal profiting." The evidence established that all Ms. Sykes did was take over the running of the December 16, 2003 City Council meeting once Mayor Swanson recused himself and vote along with the other Council members in support of the motion to authorize staff to begin negotiations with parties interested in purchasing the Siwek property. Nothing in this conduct amounts to "allowing" Swanson and Mattila to "attempt to illegally profit from their elected positions."

... Even if Plack and Stephen Jankowski believed the accusation (as they testified), they did so only with a distorted interpretation of Swanson's, Mattila's and Sykes' actions and they must bear the consequences of their reckless disregard for whether the accusation was false.

This explanation demonstrates that the ALJ panel incorrectly analyzed whether relators acted with actual malice. The first three paragraphs of the explanation address whether it was true that there was an attempt to engage in illegal conduct. A false statement is a required element of a violation of Minn.Stat. § 211B.06, subd. 1, and the ALJ panel needed to determine whether the statement was false. But whether the statement was false was not the issue to be decided with respect to actual malice. When determining whether relators acted with actual malice, the issue

was whether relators knew that the statement that Swanson, Mattila, and Sykes attempted to use their elected positions to allow Swanson and Mattila to profit illegally was false or made the statement with reckless disregard of whether it was false or not. Even if everything that Swanson, Mattila, and Sykes did was completely legal, if relators did not understand the applicable law, they could mistakenly believe that there was an attempt to act illegally and, consequently, they would not know that their statement was false.

The ALJ panel found that at the December 16, 2003 council meeting, Carson informed the council that Swanson and Mattila had made inquiries regarding the Siwek property and that Sykes took over running the council meeting and voted to authorize city staff to begin negotiations with people interested in purchasing the Siwek property. Relator Plack was at the meeting, and after learning that Swanson and Mattila were considering bidding on the Siwek property, Plack called the state auditor's office and spoke with David Kenney, an attorney with the office, who "indicated to Plack that the sale of city owned property to the Mayor or a council person would not be legal." The panel also found that in January 2004, Kenney called city attorney Carson and "told Carson that it was the position of the State Auditor's Office, as well as the Attorney General's Office and the League of Minnesota Cities, that cities could not sell land to members of the city council or the Mayor." The panel found that following this communication from Kenney,

Carson informed Swanson and Mattila that it was the position of the League of Minnesota Cities, the State Auditor and the Attorney General that it is a conflict for cities to sell real estate to council members. Given this, Carson advised both Swanson and Mattila not to bid on

the Siwek property. Based on this advice, Swanson and Mattila took no further action with respect to bidding on the Siwek property.

We do not disagree with the ALJ panel that these events could demonstrate that Swanson and Mattila did not intend to do anything illegal and that as soon as they learned that their purchasing the property would be a conflict of interest, they abandoned any attempt to do so. But the events could also be perceived by relators as demonstrating that with Sykes' assistance at the December 16 council meeting, Swanson and Mattila took preliminary steps to attempt to purchase the Siwek property, which Plack learned from the state auditor's office would not be legal, and abandoned their purchase attempts after the state auditor's office informed the city attorney that cities could not sell land to members of the city council or the mayor.

Because relators could perceive these events in this way, the ALJ panel's findings do not support its conclusion that relators knew that their statement was false. The ALJ panel concluded that relators could believe their accusation "only with a distorted interpretation of Swanson's, Mattila's and Sykes' actions and they must bear the consequences of their reckless disregard for whether the accusation was false." But this conclusion fails to recognize that with respect to actual malice, " 'reckless disregard' does not mean 'recklessness' in the ordinary sense of extreme negligence. Instead, 'reckless disregard' requires that a defendant make a statement while subjectively believing that the statement is probably false." *Chafoulias*, 668 N.W.2d at 654–55 (citations omitted). Instead of determining

whether relators subjectively believed that their accusation was probably false, the ALJ panel determined whether relators' claimed interpretation of Swanson's, Mattila's, and Sykes' actions was a reasonable interpretation. Because the panel acted under an erroneous theory of law, it erred in determining that relators acted with actual malice. Therefore, we reverse the panel's conclusion that relators violated Minn.Stat. § 211B.06, subd. 1, and the civil penalties imposed for the violations. Because we reverse the panel's conclusion on this basis, it is not necessary for us to determine whether the panel erred in determining that relators' statement was false.

## VI.

■■■ The ALJ panel determined that relators violated the disclaimer requirement in Minn.Stat. § 211B.04(a) and ordered each of them to pay a $600 civil penalty for the violations. Relators argue that the disclaimer requirement is an unconstitutional restriction on their First Amendment rights. Minn.Stat. § 211B.04(a) states:

A person who participates in the preparation or dissemination of campaign material other than as provided in section 211B.05, subdivision 1,[3] that does not prominently include the name and address of the person or committee causing the material to be prepared or disseminated in a disclaimer substantially in the form provided in paragraph (b) or (c)[4] is guilty of a misdemeanor.

When used in this statute, " '[c]ampaign material' means any literature, publication, or material that is disseminated for the purpose of influencing voting at a primary

---

**3.** Minn.Stat. § 211B.05, subd. 1, applies to paid advertisements in print and broadcast news media.

**4.** Paragraphs (b) and (c) set out in detail the required format of a disclaimer.

or other election, except for news items or editorial comments by the news media." Minn.Stat. § 211B.01, subd. 2.

In *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345, 115 S.Ct. 1511, 1518, 131 L.Ed.2d 426 (1995), the United States Supreme Court concluded that an Ohio statute that prohibited the distribution of anonymous campaign literature directly regulated the content of "pure speech" in violation of the First Amendment. The Ohio statute prohibited the production and distribution of

> a notice, placard, dodger, advertisement, sample ballot, or any other form of general publication which is designed to promote the nomination or election or defeat of a candidate, or to promote the adoption or defeat of any issue, or to influence the voters in any election ... unless there appears on such form of publication in a conspicuous place or is contained within said statement the name and residence or business address of the chairman, treasurer, or secretary of the organization issuing the same, or the person who issues, makes, or is responsible therefor.

*McIntyre*, 514 U.S. at 338–39 n. 3, 115 S.Ct. at 1514–15 n. 3.

Margaret McIntyre produced and distributed leaflets·expressing her opposition to a proposed school levy. *Id.* at 337, 115 S.Ct. at 1514. Some of the leaflets identified McIntyre as the author; others did not. *Id.* And except for some help from her son and a friend who distributed some of the leaflets, McIntyre acted independently. *Id.* A school official filed a complaint with the Ohio Elections Commission, charging that McIntyre's distribution of unsigned leaflets violated the Ohio disclaimer statute. *Id.* at 338, 115 S.Ct. at 1514. The commission agreed and imposed a fine of $100. *Id.* Ultimately, the Ohio Supreme Court affirmed the fine. *Id.* at 339, 115 S.Ct. at 1515.

In reversing the decision of the Ohio Supreme Court, the United States Supreme Court explained that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342, 115 S.Ct. at 1516. Upon examining the Ohio statute, the Supreme Court determined that

> [the statute] does not control the mechanics of the electoral process. It is a regulation of pure speech. Moreover, even though this provision applies evenhandedly to advocates of differing viewpoints, it is a direct regulation of the content of speech.... Furthermore, the category of covered documents is defined by their content—only those publications containing speech designed to influence the voters in an election need bear the required markings. Consequently, we are not faced with an ordinary election restriction; this case "involves a limitation on political expression subject to exacting scrutiny."

*Id.* at 345–46, 115 S.Ct. at 1518 (quoting *Meyer v. Grant*, 486 U.S. 414, 420, 108 S.Ct. 1886, 1891, 100 L.Ed.2d 425 (1988)). The Supreme Court explained further that, "[w]hen a law burdens core political speech, we apply 'exacting scrutiny,' and we uphold the restriction only ·if it is narrowly tailored to serve an overriding state interest." *Id.* at 347, 115 S.Ct. at 1519.

The Supreme Court then rejected Ohio's claim that its interest in preventing fraudulent and libelous statements and its interest in providing the electorate with relevant information were sufficiently compelling to justify the anonymous-speech ban. The Court concluded that "[t]he simple interest in providing voters

with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit." *Id.* at 348, 115 S.Ct. at 1520. And although it acknowledged that Ohio has a legitimate interest in preventing fraud and libel, the Supreme Court determined that this interest did not justify the broad prohibition in the Ohio statute. *Id.* at 350–51, 115 S.Ct. at 1521. The Court explained:

As this case demonstrates, the prohibition encompasses documents that are not even arguably false or misleading. It applies not only to the activities of candidates and their organized supporters, but also to individuals acting independently and using only their own modest resources. It applies not only to elections of public officers, but also to ballot issues that present neither a substantial risk of libel nor any potential appearance of corrupt advantage. It applies not only to leaflets distributed on the eve of an election, when the opportunity for reply is limited, but also to those distributed months in advance. It applies no matter what the character or strength of the author's interest in anonymity.

*Id.* at 351–52, 115 S.Ct. at 1521–22. The Court concluded:

Under our Constitution, anonymous pamphleteering is not a pernicious, fraudulent practice, but an honorable tradition of advocacy and of dissent. Anonymity is a shield from the tyranny of the majority. It thus exemplifies the purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals from retaliation—and their ideas from suppression—at the hand of an intolerant society. The right to remain anonymous may be abused when it shields fraudulent conduct. But political speech by its

nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse. Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justifies a prohibition of all uses of that speech. The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented.

*Id.* at 357, 115 S.Ct. at 1524.

In 1998, after *McIntyre* was decided, Minn.Stat. § 211B.04 was amended by adding a subsection (f), which states:

This section does not apply to an individual who acts independently of any candidate, committee, political committee, or political fund and spends only from the individual's own resources a sum that is less than $300 in the aggregate to produce or distribute campaign material that is distributed at least 14 days before the election to which the campaign material relates.

1998 Minn. Laws ch. 376, § 2, at 832.

In 2003, the Minnesota federal district court held that "Minn.Stat. § 211B.04 is unconstitutional under the First Amendment." *Minn. Citizens Concerned for Life, Inc. v. Kelley,* 291 F.Supp.2d 1052, 1069 (D.Minn.2003), *aff'd in part, rev'd in part,* 427 F.3d 1106 (8th Cir.2005). The court explained:

In response to [an opinion by the Office of the Minnesota Attorney General determining that Minn.Stat. § 211B.04 was unconstitutional], the legislature debated how best to amend Minn.Stat. § 211B.04. Many legislators were concerned that anonymity would fuel irresponsible allegations. . . .

In the end, the legislature chose to amend § 211B.04 in the narrowest possible fashion, essentially exempting the exact factual scenario before the Court in *McIntyre*. . . .

The Supreme Court's holding in *McIntyre*, however, is far broader than subsection (f) allows. While a more limited disclaimer requirement might indeed pass constitutional scrutiny, Minnesota's disclaimer requirement directly attacks core political speech "[un]supported by an interest in avoiding the appearance of corruption," *McIntyre*, 514 U.S. at 354, 115 S.Ct. 1511, 131 L.Ed.2d 426. Unlike disclosures related to lobbyists, "who have direct access to elected representatives" and thus "may well present the appearance of corruption" if their activities are not disclosed, Minnesota's disclaimer requirement "rests on different and less powerful state interests," such as ensuring responsible campaigning. *Id.* at 356, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426. Our society, however, "accords greater weight to the value of free speech than to the dangers of its misuse," *id.* at 357, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426, and unlike "ordinary election restriction[s]," § 211B.04 is a "limitation on political expression subject to exacting scrutiny," *id.* at 346, 115 S.Ct. at 1511. With no overriding interest supporting the statute, § 211B.04 cannot pass constitutional muster.

*Id.* at 1068–69 (citation omitted).

In 2004, the legislature amended Minn. Stat. § 211B.04(f) by broadening the exception from the disclaimer requirement to apply to both individuals and associations and to apply to expenditures of less than $500 and to materials distributed at least seven days before an election. 2004 Minn. Laws ch. 293, art. 3, § 2, at 1537. The OAH does not argue that the 2004 amendments make Minn.Stat. § 211B.04 constitutional under *Kelley*. Rather, the OAH argues that this court should decline to follow *Kelley*.

This court is not bound to follow *Kelley*. *See Northpointe Plaza v. City of Rochester*, 457 N.W.2d 398, 403 (Minn.App. 1990) (noting state courts are not bound by federal court decisions even as to construction of federal statutes), *aff'd*, 465 N.W.2d 686 (Minn.1991); *Jendro v. Honeywell, Inc.*, 392 N.W.2d 688, 691 n. 1 (Minn.App.1986) (noting although statutory construction of federal law by federal courts is entitled to due respect, this court is bound only by statutory interpretations of Minnesota Supreme Court and United States Supreme Court), *review denied* (Minn. Nov. 19, 1986); *see also Rasheed v. Chrysler Corp.*, 445 Mich. 109, 517 N.W.2d 19, 27 n. 20 (1994) ("Although federal precedent is persuasive, it is not binding on state courts."). But we see no basis for concluding that the federal district court's conclusion that section 211B.04 is overbroad is incorrect. Even with the amendments that broaden the exception from the disclaimer requirement, there may be circumstances in which the disclaimer requirement is violated by completely truthful anonymous statements made by individuals acting independently from any candidate and using their own resources. Respondents have not identified an overriding state interest that permits section 211B.04 to limit such political expression under the exacting scrutiny that we must apply.

When possible, this court will narrowly construe a statute "to limit its scope to conduct that falls outside first amendment protection while clearly prohibiting its application to constitutionally protected expression." *In re Welfare of R.A.V.*, 464 N.W.2d 507, 509 (Minn.1991), *rev'd on oth-*

*er grounds,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). But even if relators' conduct falls outside First Amendment protection, we see no way to narrowly construe Minn.Stat. § 211B.04 to limit its scope to include relators' conduct while prohibiting its application to protected expression. We, therefore, conclude that, in its present form, Minn.Stat. § 211B.04 directly regulates the content of pure speech in violation of the First Amendment, and we reverse the portions of the ALJ panel's order requiring relators to each pay a $600 civil penalty for violating Minn.Stat. § 211B.04(a).

### DECISION

Relators have not established beyond a reasonable doubt that the administrative-hearing process established under Minn. Stat. §§ 211B.31 to .37 violates the separation-of-powers doctrine. Neither relators' right to trial by jury nor relators' First Amendment rights were violated by the administrative process established under Minn.Stat. §§ 211B.31 to .37. Because the ALJ panel acted under an erroneous theory of law in determining that relators acted with actual malice, the panel erred in concluding that relators violated Minn. Stat. § 211B.06, subd. 1. Because Minn. Stat. § 211B.04(a) directly regulates the content of pure speech in violation of the First Amendment, the ALJ panel may not impose civil penalties on relators for violating Minn.Stat. § 211B.04(a).

**Reversed.**