**Bob FINE, Respondent,**

v.

**Jim BERNSTEIN, Relator,**

**State of Minnesota Office of Administrative Hearings, Respondent.**

No. A05–2393.

Court of Appeals of Minnesota.

Jan. 23, 2007.

Bob Fine, Minneapolis, MN, pro se respondent.

Alan W. Weinblatt, Jyotsna Asha Sharma, Luke M. Kuhl, Weinblatt & Gaylord, PLC, St. Paul, MN, for relator.

Lori Swanson, Attorney General, Kenneth E. Raschke, Jr., Assistant Attorney General, St. Paul, MN, for respondent Office of Administrative Hearings.

Considered and decided by RANDALL, Presiding Judge, HALBROOKS, Judge, and STONEBURNER, Judge.

## O P I N I O N

RANDALL, Judge.

Respondent filed a complaint with the Minnesota Office of Administrative Hearings in response to campaign materials prepared and disseminated by relator. The complaint alleged violations of the Minnesota Fair Campaign Practices Act, specifically Minn.Stat. §§ 211B.04 and .06 (2004). The office of administrative hearings found relator in violation of section 211B.06 because of three statements included on a campaign flyer. Relator was assessed an $800 penalty. We affirm.

## FACTS

Relator Jim Bernstein ("Bernstein") was a candidate in the November 8, 2005 election for the Minneapolis Park and Recreation Board ("Park Board") in the sixth park district. Respondent Bob Fine ("Fine"), the incumbent, was first elected to the Park Board in 1997 as an at-large park commissioner, and was re-elected in 2001. Fine has served as Park Board president since 2002. As president, Fine did not serve on any Park Board committees.

During his campaign for election, Bernstein distributed flyers and published campaign advertisements. On October 12, 2005, Fine filed a complaint with the office of administrative hearings ("OAH") against Bernstein, alleging that Bernstein violated the Minnesota Fair Campaign Practices Act, specifically Minn.Stat. §§ 211B.04 and .06 (2004), by preparing and disseminating campaign materials without a disclaimer and containing false statements. .

Bernstein's flyer compared his positions to Fine's positions on seven park-related issues. Fine first saw the flyer in October 2005, and subsequently spoke with people, including reporters, about what he considered to be false statements in the flyer. Fine did not distribute rebuttal materials or respond to the flyer with his own campaign materials, explaining that, "I feel it's below me to talk about negative things, and I'm above that. I consider statements that are absolutely false about me to have to respond to those issues is below me."

On October 14, 2005, an administrative law judge ("ALJ") determined that Fine's complaint set forth prima facie violations of Minn.Stat. §§ 211B.04 and .06. By order dated October 20, 2005, the ALJ found probable cause to believe that Bernstein violated Minn.Stat. §§ 211B.04 and .06 in certain regards, but not in all aspects alleged. The matter was subsequently set

for an evidentiary hearing before a panel of three administrative law judges (the "panel") pursuant to Minn.Stat. § 211B.35, subd. 1 (2004).

The evidentiary hearing was held on October 31 and November 2, 2005. On November 7, 2005, the panel issued its opinion, concluding that Bernstein's newspaper advertisement and three statements on the flyer were not in violation of the Minnesota Fair Campaign Practices Act. The panel did find the following three statements in the flyer to be in violation of Minn.Stat. § 211B.06:

(1) More funding for speedy removal of trees infected by Dutch Elm disease and replant new trees?—Doesn't Support;

(2) Provide superintendent with a $500,000 slush fund?—Yes!; and

(3) Fund and finish Lake of the Isles restoration?—Not a priority.

The OAH fined Bernstein $800 for the violations. Pursuant to Minn.Stat. § 211B.36, subd. 5 (2004), Bernstein appealed by certiorari to this court.

## ISSUES

I. Did the OAH err in concluding that three statements in a campaign flyer violated Minn.Stat. § 211B.06 (2004)?

II. Does the OAH's use of a penalty matrix constitute unpromulgated rulemaking in violation of the Minnesota Administrative Procedures Act?

## ANALYSIS

### I.

Agency decisions are presumed correct, and this court defers to an agency's expertise and its special knowledge in the field of its technical training, education, and experience. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.

1977). An agency decision will be reversed only when it constitutes an error of law, when the findings are arbitrary and capricious, or when the findings are unsupported by substantial evidence. *In re Hutchinson,* 440 N.W.2d 171, 176 (Minn. App.1989), *review denied* (Minn. Aug. 9, 1989). An agency's conclusions are not arbitrary and capricious if a rational connection between the facts found and the choice made is articulated. *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 277 (Minn.2001). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Nat'l Audubon Soc'y v. Minn. Pollution Control Agency,* 569 N.W.2d 211, 215 (Minn.App.1997), *review denied* (Minn. Dec. 16, 1997). On appeal, the appealing party bears the burden of establishing that the findings of the agency are unsupported by the evidence in the record, considered in its entirety. *Reserve Mining Co.,* 256 N.W.2d at 825.

In a hearing before an ALJ panel, the complainant bears the burden of proof, and a violation of Minn.Stat. § 211B.06 (2004), relating to false statements in campaign materials, must be proved by clear and convincing evidence. Minn.Stat. § 211B.32, subd. 4 (2004). To prove that Bernstein violated Minn.Stat. § 211B.06, Fine needed to prove by clear and convincing evidence that the campaign materials distributed by Bernstein contained false statements, and either that Bernstein knew the statements to be false, or that he recklessly disregarded whether the statements were false.

The OAH determined that three statements included on Bernstein's flyer violated Minn.Stat. § 211B.06, subd. 1. Bernstein argues that the OAH's conclusion is based on erroneous findings that Bernstein

made false statements and that the statements were made with actual malice.

■ Minn.Stat. § 211B.06, subd. 1 states:

A person is guilty of a gross misdemeanor who intentionally participates in the preparation, dissemination, or broadcast of paid political advertising or campaign material with respect to the personal or political character or acts of a candidate ... that is designed or tends to elect, injure, promote, or defeat a candidate for nomination or election to a public office ... that is *false,* and that the person *knows is false* or communicates to others with *reckless disregard* of whether it is false.

(Emphasis added.) · A violation of Minn. Stat. § 211B.06, subd. 1, requires a finding of both a false statement and actual malice or reckless disregard. *Riley v. Jankowski,* 713 N.W.2d 379, 399 (Minn.App.2006), *review denied* (Minn. July 19, 2006).

The OAH concluded that "[Fine] has shown by clear and convincing evidence that [Bernstein] violated Minn.Stat. § 211B.06, subd. 1, by preparing and disseminating campaign material that contained [three] false statements that [Bernstein] knew were false or communicated to others with reckless disregard of whether they were false...." The panel also found that "[t]he violations were multiple and were committed knowingly or with reckless disregard of the truth."

### A. Political Speech

Bernstein argues that his statements, made during an election campaign, criticizing his opponent, an elected public official, are completely protected by the First Amendment. The First Amendment to the United States Constitution provides in relevant part that, "Congress shall make no law ... abridging the freedom of speech, or of the press...." U.S. Const.

amend. I. These First Amendment protections apply with equal force to the States. *Alexander v. City of St. Paul,* 303 Minn. 201, 204 n. 5, 227 N.W.2d 370, 372 n. 5 (1975).

■ The seminal case of *N.Y. Times v. Sullivan* highlighted our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open...." 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). The First Amendment " 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Eu v. San Francisco County Democratic Cent. Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989) (citing *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971)). "The 'election campaign is a means of disseminating ideas as well as attaining political office.' " *Id.* (citing *Ill. Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 186, 99 S.Ct. 983, 991, 59 L.Ed.2d 230 (1979)). During the pre-election campaign period, the public has a right to know an incumbent's previous actions and the details of programs proposed by candidates to be enacted into law and administered. Pledges by candidates to follow certain paths are not only expected, but desirable, so that voters may choose between proposed agendas that affect the public. *See N.Y. Times,* 376 U.S. at 269, 84 S.Ct. at 720 (stating that constitutional protections for speech and press were "fashioned to assure unfettered interchange of ideas for bringing about political and social changes desired by the people"). "[I]n order to protect a vigorous marketplace in political ideas and contentions, we ought to accept the proposition that those who place themselves in a political arena must accept a degree of derogation that others need not." *Ollman v. Evans,* 750 F.2d 970, 1002 (D.C.Cir.1984) (Bork, J.,

concurring). Statements criticizing official conduct do not lose constitutional protection merely because they are criticisms and effectively diminish an official's reputation. *See N.Y. Times,* 376 U.S. at 279, 84 S.Ct. at 725.

■ Bernstein is correct in his assertion that political speech receives greater protection under the First Amendment; however, the liberty of speech *is not an absolute right. Near v. Minn.,* 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931). A state's police power permits a state to punish an abuse of the freedom of speech. *Id.; see Stromberg v. People of Cal.,* 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931). The Supreme Court in *Gitlow v. New York* stated:

> It is a fundamental principle, long established, that the freedom of speech ... which is secured by the Constitution, does not confer an absolute right to speak or publish, without responsibility, whatever one may choose, or an unrestricted and unbridled license that gives immunity for every possible use of language and prevents the punishment of those who abuse this freedom.

268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138 (1925). Political speech is protected under the First Amendment, *but,* this protection is not absolute. Simply because Bernstein's assertions are political statements made during an election campaign does not shield him from a state's ability to punish an abuse of the liberty of speech.[1]

### B. Opinion or Fact

■ Bernstein argues that the OAH erred in categorizing his statements as actionable statements of fact rather than as protected statements of opinion. The First Amendment protects statements of opinion. *Hunt v. Univ. of Minn.,* 465 N.W.2d 88, 93 (Minn.App.1991). This protection exists because (supposedly) there is no such thing as a false opinion. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974). Four factors are used to distinguish a protected statement of opinion from an actionable statement of fact: (1) a statement's precision and specificity; (2) a statement's verifiability; (3) the social and literary context in which the statement was made; and (4) a statement's public context. *Janklow v. Newsweek, Inc.,* 788 F.2d 1300, 1302–03 (8th Cir.1986).

■ The statement in question is not necessarily the literal phrase published but rather what a reasonable reader would have understood the author to have said: "Expressions of opinion, rhetoric, and figurative language are generally not actionable if, in context, the audience would understand the statement is not a representation of fact." *Jadwin v. Minneapolis Star & Tribune Co.,* 390 N.W.2d 437, 441 (Minn.App.1986). Determining whether a statement is an opinion or a fact is a question of law. *Lund v. Chicago & Nw. Transp. Co.,* 467 N.W.2d 366, 368 (Minn.App.1991), *review denied* (Minn. Jun. 19, 1991). "In considering such questions of law, reviewing courts are not bound by the decision of the agency and need not defer to agency expertise." *St. Otto's Home v. Minn. Dep't of Human Servs.,* 437 N.W.2d 35, 39–40 (Minn.1989).

Throughout his brief, Bernstein relies upon *Kennedy v. Voss,* a Minnesota Supreme Court decision stating that the stat-

---

1. It is unclear from his brief, but Bernstein does not appear to challenge the constitutionality of Minn.Stat. § 211B.06. Instead, Bernstein merely claims that his statements were protected under the First Amendment. The constitutionality of Minn.Stat. § 211B.06 has not been challenged; therefore, the issue is not addressed here.

ute is "directed against the evil of making false statements of fact and not against criticism of a candidate or unfavorable deductions derived from the candidate's conduct." 304 N.W.2d 299, 300 (Minn.1981) (discussing predecessor statute, Minn.Stat. § 210A.04 (1980)). In *Kennedy*, a candidate used a fact—an incumbent's "no" vote on a county budget—to infer that the incumbent did not support any of the individual items in the budget. *Id.* The incumbent supported various items in the budget, however, voted "no" because the budget included an appropriation with which the incumbent disagreed. *Id.* at 299–300. The Minnesota Supreme Court held that the inferences, even though extreme and illogical, did not come within the purview of the statute. *Id.* at 300. The court pointed out that the public was adequately protected from the candidate's extreme and illogical inferences by the incumbent's rebuttal flyers. *Id.* The campaign process provided voters with an opportunity to judge for themselves what inferences could properly be drawn from the candidates' records. *Id.*

Bernstein argues that his statements, similar to those in *Kennedy*, are his unfavorable deductions, based on Fine's public record of action and inaction. Contrary to Bernstein's assertion, we conclude that *Kennedy* differs from the present case in several respects. First, the predecessor statute used in *Kennedy* required only a finding of a false statement. 304 N.W.2d at 300. Second, the appellant in *Kennedy* was seeking to void the election results. *Id.* Finally, Fine never engaged in a blanket vote against any of the programs commented on in Bernstein's statements. Instead, Park Board records, which Bernstein admittedly reviewed, indicated *Fine's support* of Dutch Elm disease funding and the Lake-of-the-Isles project. Park Board records also indicated the falsity of Bernstein's statement regarding the "slush fund."

**1. "More funding for speedy removal of trees infected by Dutch Elm disease and replant new trees?—Doesn't Support"**

■ Bernstein argues that this statement is neither precise nor verifiable since the degree of one's support is neither quantifiable nor provable. Additionally, Bernstein argues that his statement appeared in a campaign flyer, where criticisms are expected. The OAH, however, simply found the statement to be a false fact. We agree.

Consistent with Bernstein's argument, the statement is neither precise nor specific, as ordinary minds could disagree with the meaning of "more." However, evidence established that Fine fully supported $800,000 in increased funding in 2004 and an additional $1 million in 2005 for the Park Board's project. These were verifiable facts in Park Board records. Bernstein testified to reviewing Park Board records, and claimed that "more funding" meant that Fine did not support "more" funding than the $1 million of additional funding recommended by Park Board staff. Bernstein's purported meaning of "more" is not evident from the context, is disingenuous, and not likely to be the ordinary meaning attached to the statement by a reasonable person. A reasonable person would have read the statement and understood that Bernstein was referring to Fine's support of "additional" funding, which is a fact that could be—and was—proven false because of Fine's actual support of increased funding in both 2004 and 2005. Bernstein could have expressed an opinion about Fine's overall support for tree removal projects, but his actual statement was properly characterized as an assertion of fact that was known to be false.

## 2. "Provide Superintendent with a $500,000 slush fund?—Yes!"

 Bernstein argues that this statement is an expression of opinion about the lack of adequate parameters or guidelines for spending. The OAH found the statement to be a false factual assertion, because the fund was not an undesignated fund and the superintendent was not authorized to spend $500,000 without supervision. We agree. The parties do not dispute that Fine supported the 2005 budget, which contained a provision for an "investment" or "innovation" fund. Sufficient information was available from the Park Board regarding the nature of the fund, including that Fine supported the 2005 budget, that the superintendent could only make expenditures of up to $50,000 without Park Board approval, and that the fund was never authorized. The OAH emphasized that the term "slush fund" carries a negative connotation to the reasonable person. "Today the phrase [slush fund] always carries connotations of moral impropriety, and sometimes of legal impropriety." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 813 (2d ed. 1995).

Again, Bernstein could have expressed an opinion about Fine's support of discretionary funds, but a reasonable reader would understand the statement, in this context, to be a factual description of a particular fund and the fact is false. Fine did not support a "slush fund," as a reasonable person understands that term.

## 3. "Fund and finish Lake of the Isles restoration?—Not a Priority"

 Bernstein argues that whether something is a "priority" is a matter of opinion and unverifiable. The OAH found this to be a false statement given evidence showing that the project had been one of the Park Board's highest priorities for several years. We agree.

In general, "priority" can be a subjective term. Here, the Park Board utilized a priority ranking scheme for projects.[2] It was documented in Park Board records that the Lake–of–the–Isles project had always been an "A" priority project. In this context, "priority" has a specific factual meaning. The evidence illustrated that Fine voted in favor of the project receiving the highest priority level and, further, that he attempted to obtain additional funding through his membership on the Minneapolis Board of Estimate and Taxation. These two facts are readily ascertainable from Park Board official records. The truth or falsity of the statement was demonstrable and verifiable. Bernstein's assertion regarding Lake of the Isles constituted a distorted fact.

We understand Bernstein's argument that "mere opinions" are protected. But in examining the statements and giving due deference to the credibility determinations made by the OAH, it was not unreasonable for the OAH to characterize the challenged statements as "facts."

## C. Actual Malice or Reckless Disregard

 "Actual malice" is a term of art; it means that the defendant acted "with knowledge that [the publication] was false or with reckless disregard of whether it was false or not." For example, as the Supreme Court has noted, a statement may have been made with actual malice if it "is fabricated by the defendant, is the product of his imagination, ... is based wholly on an unverified anonymous telephone call [or if] the publisher's allegations are so inherently improbable that only a reckless man

2. The Park Board's priority ranking system is as follows: "A" (top priority); "B" (second-ary priority); and "E" (monitor and assist efforts of others).

would have put them in circulation." Moreover, "actual malice" does not mean that the defendant acted with ill will or spite.

Notably, the standard for "reckless disregard for truth" is a subjective one; reckless disregard does not mean "recklessness" in the ordinary sense of extreme negligence. Instead, "reckless disregard" requires that a defendant make a statement while subjectively believing that the statement is probably false.

*Chafoulias v. Peterson*, 668 N.W.2d 642, 654–55 (Minn.2003) (citations and quotations omitted). A complaint filed with the OAH alleging a violation of Minn.Stat. § 211B.06, subd. 1, is not a defamation action; however, the plain language of the statute includes the definition of actual malice set forth in *Chafoulias*. *Riley*, 713 N.W.2d at 399. Therefore, in *Riley*, this court deemed it appropriate to analyze actual malice similarly to a defamation case. *Id.* When determining whether Bernstein acted with actual malice, the issue was whether Bernstein knew that the statement was false or made the statement with reckless disregard as to whether or not it was false.[3]

**1. "More funding for speedy removal of trees infected by Dutch Elm disease and replant new trees?—Doesn't Support"**

■ During 2004, the Park Board incurred unexpectedly high costs associated with the removal of trees affected by Dutch Elm disease. To remedy the problem, the Park Board approved $800,000 of additional funding in 2004 and increased funding by $1 million in 2005. Fine supported and voted in favor of both increases.

Having reviewed Park Board records, Bernstein testified that he could not find any evidence of Fine supporting additional funds *above* the amounts recommended by Park Board staff. Bernstein apparently planned to propose funding *above* Park Board staff recommendations. The statement in Bernstein's campaign literature did not make this distinction. Instead, the flyer stated that Fine doesn't support more funding (period!), when, in fact, Fine actually had supported additional funding in both 2004 and 2005. Bernstein knew that his statement was false or made the statement with reckless disregard of whether or not it was false.

**2. "Provide Superintendent with a $500,000 slush fund?—Yes!"**

■ At the end of 2004, Park Board staff presented a recommended budget for 2005. The recommended budget contained a $500,000 "investment" or "innovation" fund for capital improvement projects. The fund's purpose was to provide the superintendent with the ability and authority to undertake projects with quick paybacks, i.e., projects that would save the Park Board money in the near future by way of decreased operating costs. The Park Board, including Fine, supported the

---

**3.** Bernstein, in a reply brief, seeks to limit the issues on appeal to those raised in his petition for writ of certiorari and moves to strike portions of Fine's brief that raise new issues. In his brief, Fine discusses three statements found by the OAH not to be in violation of Minn.Stat. § 211B.06, and the issue of section 211B.04, presence of a disclaimer. Fine does not fully brief these matters and, for the most part, raises these remarks as comparisons in his discussion of the issues before the court. Fine failed to file a notice of review pursuant to Minn. R. Civ.App. P. 106. ("A respondent may obtain review of a judgment or order entered in the same action which may adversely affect respondent by filing a notice of review with the clerk of the appellate courts."). Since Fine failed to file a notice of review, only the issues raised by relator are before this court.

recommended 2005 budget, with the inclusion of the investment fund. The investment fund, however, was never formally voted upon, after being tabled by the administration and finance committee.

Bernstein testified to reviewing Park Board records regarding the investment fund and deciding to identify it as a "slush fund" in his campaign materials. Bernstein utilized this terminology because of his belief in the discretionary nature of the fund and the lack of accountability attached to spending the fund money. At trial, however, Bernstein acknowledged that the superintendent could only spend $50,000 per project from the fund.

Bernstein relied upon widely distributed literature published by Minneapolis Citizens for Park Board Reform, a citizens' group advocating for a new Park Board, discussing the investment fund which Fine had made no effort to refute. However, Bernstein knew at the time he published his flyer that the proposal for the fund had been tabled and that the superintendent's discretionary authority was limited to $50,000. Bernstein knew that his statement was false or made the statement with reckless disregard for whether or not it was false.

### 3. "Fund and finish Lake of the Isles restoration?—Not a Priority"

 During the last five years, the Lake-of-the-Isles restoration project has been a "top priority" item for the Park Board before the state legislature. Fine testified to attending various neighborhood, legislative, and Park Board meetings focusing on this project. Fine also advocated for the project through his position on the Minneapolis Board of Estimate and Taxation.

Bernstein consulted Park Board online records, following which he concluded that because Fine had not "proposed any addi-tional funding to fix Lake of the Isles," the project was "not a priority" for Fine. The ALJ panel concluded that Bernstein engaged in "faulty logic," because the project had, over several years, held the Park Board's highest legislative priority. If Bernstein reviewed Park Board records, as he claims, the priority ranking of the project was obvious. Bernstein acted with reckless disregard by publishing and disseminating this statement.

### D. Arbitrary and Capricious

 Bernstein argues that the OAH's decision was arbitrary and capricious. An agency's ruling is arbitrary and capricious if it

(a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.

*White v. Minn. Dep't of Natural Res.*, 567 N.W.2d 724, 730 (Minn.App.1997) (quotation omitted), *review denied* (Minn. Oct. 31, 1997). "[T]he agency's conclusions are not arbitrary and capricious so long as a rational connection between the facts found and the choice made has been articulated." *Blue Cross & Blue Shield*, 624 N.W.2d at 277 (quotation omitted).

Bernstein argues that the OAH decision was inconsistent, "attempt[ing] to issue Solomonic 'divide the baby in half' decisions, finding some statements to be in violation and others not. . . ." We find the decision neither arbitrary nor capricious. As previously discussed, the OAH based its findings of actual malice or reckless disregard on Bernstein's testimony that he read and reviewed Park Board records. Adequate relevant evidence is in the record to support the OAH decision.

## II.

█ On writ of certiorari, we determine whether the agency violated the constitution, exceeded its authority, engaged in unlawful procedure, erred as a matter of law, issued a decision unsupported by substantial evidence, or acted arbitrarily or capriciously. Minn.Stat. § 14.69 (2004). A reviewing court defers to the agency's expertise in fact finding, and will affirm the agency's decision if it is lawful and reasonable. *Reserve Mining Co.*, 256 N.W.2d at 824–26. When reviewing questions of law, however, we are not bound by the agency's decision and need not defer to the agency's expertise. *No Power Line, Inc. v. Minnesota Envtl. Quality Council*, 262 N.W.2d 312, 320 (Minn.1977). Bernstein argues that the penalty matrix is a set of rules that have not undergone the requisite public notice and comment period required by the Minnesota Administrative Procedures Act.

█ An ALJ panel finding violations of Minnesota Statute chapter 211A or 211B may impose sanctions ranging from issuance of a reprimand to imposition of a maximum civil penalty of $5,000. Minn. Stat. § 211B.35, subd. 2 (2004). The OAH developed the penalty matrix as guidance "in order to assure some consistency from one case to the next." [4] (*http://www.oah. state.mn.us/faircampaign/Campaign PenaltyMatrix.htm*). The OAH recognizes that "[e]very case is different, and each penalty will be selected to reflect the specific facts of the case." *Id.* Since the OAH has only recently been charged with the responsibility of adjudicating some charges of illegal political campaign activi-

ty,[5] it developed the matrix "[u]ntil the office gains more experience that will permit it to refine the penalty matrix.... The Office anticipates that additional experience will cause it to change the matrix." *Id.*

The matrix provides a range of penalties for infractions based on the gravity and willfulness of the violation found. *Id.* The matrix is in conformity with Minn.Stat. § 14.045, subd. 3(a) (2004), which provides:

> 3. **Factors.** (a) If a statute or rule gives an agency discretion over the amount of a fine, the agency must take the following factors into account in determining the amount of the fine:
>
> (1) the willfulness of the violation;
>
> (2) the gravity of the violation, including damage to humans, animals, and the natural resources of the state;
>
> (3) the history of past violations;
>
> (4) the number of violations;
>
> (5) the economic benefit gained by the person by allowing or committing the violation; and
>
> (6) other factors that justice may require.

The OAH argues in the alternative, if the matrix is considered an unpromulgated rule, that Bernstein's penalty still should not be vacated. The penalty imposed upon Bernstein, $800, was within, and at the low end, of the statutorily provided range. The OAH found that Bernstein's "violations were multiple, done knowingly or with reckless disregard of the truth." Since the factors used to determine Bernstein's penalty, willfulness and gravity of

---

4. The campaign matrix is not set out in chapter 14. The matrix is available at the OAH website (*http://www.oah.state.mn.us/ faircampaign/CampaignPenaltyMatrix.htm*).

5. 2004 Minn. Laws ch. 277, § 7, at 1167 (enacting Minn.Stat. § 211B.32, subd. 1 Ad-

ministrative Remedy; Exhaustion. "A complaint alleging a violation of chapter 211A or 211B must be filed with the office. The complaint must be finally disposed of by the office before the alleged violation may be prosecuted by a county attorney.").

the violation, are consistent with those mandated in Minn.Stat. § 14.045, subd. 3(a), we conclude the penalty is valid.

Bernstein argues that the penalty matrix is unconstitutional because it "levies penalties for 'negligent,' 'ill-advised,' 'ill-considered,' and 'inadvertent' violations." But a violation of Minn.Stat. § 211B.06 requires a showing of a false statement and actual malice or reckless disregard. Bernstein was not fined on the basis of any statement found to be "negligent" or "inadvertent." Reckless disregard requires a showing of more than negligence. *Riley*, 713 N.W.2d at 399.

The penalty assessed on Bernstein was within the statutorily prescribed limits of $0 to $5,000. The OAH's use of the penalty matrix as guidance for consistency, coupled with the recognition that each case is fact specific, did not constitute de facto rulemaking.

## D E C I S I O N

It was neither arbitrary nor capricious for the OAH to find that Bernstein acted with actual malice or reckless disregard by publishing and disseminating false factual statements. The finding of statutory violations is affirmed.

The use of a penalty matrix by the OAH did not constitute unpromulgated rulemaking. The penalty imposed was proper.

**Affirmed.**