*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0029**

Republican Party of Minnesota,
Respondent,

vs.

Nathan Miller, et al.,
Relators,

Attorney General Keith Ellison,
Intervenor.

**Filed January 16, 2024
Affirmed
Smith, Tracy M., Judge**

Office of Administrative Hearings
File No. 60-0320-38740

R. Reid LeBeau, Jacobson, Magnuson, Anderson & Halloran, P.C., The Jacobson Law Group, St. Paul, Minnesota (for respondent)

Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A., Minneapolis, Minnesota (for relators)

Keith Ellison, Attorney General, Janine Kimble, Assistant Attorney General, St. Paul, Minnesota (for intervenor)

        Considered and decided by Smith, Tracy M., Presiding Judge; Segal, Chief Judge; and Gaïtas, Judge.

**SMITH, TRACY M.**, Judge

Relator Nathan Miller, a political candidate in the November 2022 election,[1] challenges the determination by the Minnesota Office of Administrative Hearings (OAH) that he made a false statement implying support of a major political party, in violation of Minnesota Statutes section 211B.02 (2022), as well as the fine that OAH levied against him for that violation. Miller also asserts that section 211B.02, as applied to him, is unconstitutional because it violates his rights of free speech and association. Because OAH did not make an error of law and had sufficient evidence for its decision, and because the statute is constitutional as applied to Miller, we affirm.

**FACTS**

In the November 2022 election, Miller ran as a write-in candidate for Minnesota State Senate District 9. Miller had first sought the endorsement of respondent Republican Party of Minnesota, but the party endorsed another candidate. Miller then ran in the party's primary election but lost to the party's endorsed candidate. After losing the primary, Miller filed with the Minnesota Secretary of State as a write-in candidate for the general election.

During his campaign, Miller accepted an invitation to participate in an October 15, 2022 rally to be hosted by the group Caravan of Patriots. Caravan of Patriots produced a flyer for the event, which is reproduced below. Miller posted the flyer to his campaign

---

[1] Miller's campaign committee is also a relator, but, consistent with the single brief submitted by relators, we refer only to Miller in this opinion.

website. The flyer indicated that Miller would attend the rally, and underneath his name it stated, "(SD 9 – Republican Party)."



The day before the event, the Republican Party of Minnesota filed a complaint with OAH, alleging that Miller's posting of the flyer to his website violated Minnesota Statutes section 211B.02 because the flyer stated and implied that the Republican Party of Minnesota endorsed Miller for the State Senate District 9 seat. The party also alleged that other statements by Miller violated the statute. Shortly thereafter, an administrative law judge determined that the Republican Party of Minnesota had alleged a prima facie violation and then determined that there was probable cause that Miller had violated the statute.

The matter was then submitted to a panel of three administrative law judges based on the record and written and oral closing arguments. During the pendency of the

3

complaint, the Republican Party of Minnesota's endorsed candidate won the November 2022 election for Minnesota State Senate District 9, defeating both Miller and the Democratic-Farmer-Labor (DFL) Party candidate.

In December 2022, the panel issued its findings of fact, conclusions of law, and order. It determined that Miller's posting of the flyer falsely implied that he had the support or endorsement of a major political party in violation of Minnesota Statutes section 211B.02. Using OAH's penalty matrix, the panel determined that Miller's violation was "negligent" and "may have had some impact on voters" and imposed a fine of $250.

Miller appeals by writ of certiorari, challenging OAH's decision and arguing that section 211B.02 is unconstitutional as applied to him. The Republican Party of Minnesota did not file a responsive brief.[2] Minnesota Attorney General Keith Ellison intervened for the limited purpose of defending the constitutionality of section 211B.02.

**DECISION**

## I. OAH's decision was not affected by an error of law and is supported by substantial evidence.

Miller first challenges (A) OAH's determination that he violated Minnesota Statutes section 211B.02 and (B) the fine that OAH imposed.

Generally, complaints of unfair campaign practices, including violations of Minnesota Statutes section 211B.02, must be filed with and decided by OAH. Minn. Stat. § 211B.32, subd. 1(a) (2022). On appeal, OAH's decision is presumed to be correct.

---

[2] Under the Minnesota Rules of Civil Appellate Procedure, when a respondent does not submit a brief, we decide the case on the merits. Minn. R. Civ. App. P. 142.03.

*Lewison v. Hutchinson*, 929 N.W.2d 444, 447 (Minn. App. 2019). An appellate court can reverse or remand only if the substantial rights of the relator have been prejudiced because the decision was (1) in violation of constitutional provisions, (2) in excess of the authority of the agency, (3) made through an unlawful procedure, (4) affected by other error of law, (5) unsupported by substantial evidence, or (6) arbitrary or capricious. Minn. Stat. § 14.69 (2022); *see* Minn. Stat. § 211B.36, subd. 5 (2022) (providing for judicial review of OAH determinations of election-law violations via Minn. Stat. § 14.69).

Appellate courts review questions of statutory interpretation de novo. *J.D. Donovan, Inc. v. Minn. Dep't of Transp.*, 878 N.W.2d 1, 4 (Minn. 2016). In a challenge asserting that an OAH decision was not supported by substantial evidence, the relator has "the burden of establishing that the findings of the agency are unsupported by the evidence in the record, considered in its entirety." *Fine v. Bernstein*, 726 N.W.2d 137, 142 (Minn. App. 2007), *rev. denied* (Minn. Apr. 17, 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

### A.     Violation of the Statute

Section 211B.02 reads in relevant part: "A . . . candidate may not knowingly make, directly or indirectly, a false claim stating or implying that a candidate . . . has the support or endorsement of a major political party . . . ." Miller contends that OAH made an error of law and a decision unsupported by substantial evidence when it determined that the flyer's statement "SD 9 – Republican Party" under his name on the rally flyer falsely implied that the Republican Party of Minnesota supported or endorsed him.

5

First, Miller argues that OAH committed legal error by determining that the flyer's statement implied that a "major political party" had supported or endorsed him because the flyer stated only "Republican Party"—not "Republican Party of Minnesota"—and the national Republican Party is not a "major political party" under the statute.

There is no dispute that the Republican Party of Minnesota is the relevant "major political party" in this matter. *See* Minn. Stat. § 200.02, subd. 7 (2022) (defining "major political party"); Minn. Sec'y of State, *Elections & Voting, How Elections Work, Political parties*, https://www.sos.state.mn.us/elections-voting/how-elections-work/political-parties [https://perma.cc/Q5LJ-7SBQ] (listing the current major political parties). Contrary to Miller's argument, OAH did not interpret "major political party" to include the national Republican Party. Rather, OAH explicitly stated that the Republican Party of Minnesota was the major political party at issue and determined that Miller had implied the support or endorsement of the Republican Party of Minnesota. Miller's argument that OAH legally erred is unavailing.

Second, Miller contends that OAH's determination that the statement "impl[ied] . . . the support or endorsement" of the Republican Party of Minnesota is not supported by substantial evidence. Miller suggests that the statement reflected merely that he was a "republican" and "a member of the Republican Party."

But, in other election-law cases, Minnesota courts have decided that using the name or initials of a political party is sufficient to imply the support or endorsement of the political party. In *In re Ryan*, the Minnesota Supreme Court sustained the factfinder's determination that placing the terms "DFL" and "LABOR ENDORSED" on campaign

6

materials implied that the candidate was supported or endorsed by Minnesota's DFL party. 303 N.W.2d 462, 465-66 (Minn. 1981).

And, in *Schmitt v. McLaughlin*, a case relied on in *Ryan*, the supreme court affirmed the determination that a candidate's use of the initials "DFL" in his advertisements and lawn signs violated the statute by falsely implying that the candidate had the support or endorsement of the DFL party. 275 N.W.2d 587, 591 (Minn. 1979). The supreme court wrote that the candidate's "use of the initials 'DFL' would imply to the average voter that [he] had the endorsement or, at the very least, the support of the DFL party," explaining that "[t]o hold otherwise would render the word 'imply' meaningless." *Id.* The *Schmitt* court further stated that the candidate "could have informed the voters of his political affiliation"—while avoiding the implication of party endorsement or support—"had he done so clearly by the use of such words as 'member of' or 'affiliated with' in conjunction with the initials 'DFL.'" *Id.*

Like in *Schmitt*, Miller's use of the phrase "Republican Party" in the context of his posting would imply to the average voter that Miller had the support or endorsement of the party, especially since Miller did not state that he was simply a "member of" or "affiliated with" the Republican Party. And, although the full phrase "Republican Party of Minnesota" was not on the rally flyer, Miller has not shown that the record lacks evidence that a reasonable mind would accept as adequate to support the conclusion that the use of "Republican Party" implied support or endorsement by the Republican Party of Minnesota. In the context of a Minnesota state election, use of the term "Republican Party" on a rally

7

flyer is enough to indicate by implication that Miller was supported or endorsed by the Republican Party of Minnesota.

Because Miller has not shown an error of law or a lack of adequate evidence to support OAH's decision that Miller implied the support or endorsement of the Republican Party of Minnesota when he posted a rally flyer using the phrase "SD 9 – Republican Party" under his name, OAH did not err by determining that Miller violated Minnesota Statutes section 211B.02.

### B.     Monetary Fine

Miller also challenges OAH's imposition of a monetary fine based on the violation. He contends that OAH's determination that his statement was "negligent" is not supported by the record because his statement was truthful. He also argues that OAH's determination that his statement "may have had some impact on voters" was speculation and is not supported by the record.

For a violation of Minnesota Statutes section 211B.02, OAH may impose a civil penalty of up to $5,000. Minn. Stat. § 211B.35, subd. 2(d) (2022). Under Minnesota Statutes section 14.045, subdivision 3 (2022), OAH must consider several factors in determining the amount of a fine, including the "willfulness of the violation" and the "gravity of the violation." OAH has developed a penalty matrix that, consistent with section 14.045, subdivision 3, measures the willfulness of the violation on one axis and the gravity of the violation on the other axis. *See* Minn. Off. of Admin. Hearings, *Home, Self Help, Administrative Law Overview, Fair Campaign Practices*, https://mn.gov/oah/self-help/administrative-law-overview/fair-campaign.jsp [https://perma.cc/XV6N-UQ84]; *see*

8

*also Fine*, 726 N.W.2d at 149. On the "willfulness" axis, the middle category is "negligent, ill-advised, ill-considered." On the "gravity of violation" axis, the lowest category is "minimal/no impact on voters, easily countered." The fine range for a "negligent" violation that has "minimal/no impact on voters" is $250 to $600. OAH determined that Miller's violation fell on that point in the matrix and imposed a fine of $250.

Miller has not shown that OAH's decision is not supported by substantial evidence. First, as to the willfulness of the statement, as we concluded above, substantial evidence supports OAH's finding that Miller falsely implied the support or endorsement of the Republican Party of Minnesota. Because OAH relied on that finding when evaluating the willfulness of Miller's violation, that part of OAH's fine determination was supported by the record.

Second, as to the gravity of the violation, OAH stated that Miller's violation "may have had some impact on voters." OAH went on to state:

> [G]iven that [Miller] was a write-in candidate, it is not likely that many voters were misled or confused. Moreover, [Miller] widely publicized the fact that he was a write-in candidate running against the [Republican Party of Minnesota] endorsed candidate. These factors mitigate the violation and support imposition of a penalty at the lower end of the range.

OAH's determination was supported by the record. The record contains several affidavits, submitted by Miller, in which the affiants aver that they were not confused by the rally flyer—supporting OAH's determination that it is not likely that many voters were misled. Yet the publication of the false statement in the context of a campaign event provides support for OAH's determination that the statement "may have had some impact on

9

voters." OAH found that the gravity of the violation fell in the lowest category based on the record and assessed the fine accordingly.

OAH has the authority to impose a fine of up to $5,000 for a violation of section 211B.02. Minn. Stat. § 211B.35, subd. 2(d). Its decision to impose a $250 fine for Miller's violation is supported by substantial evidence in the record.

**II.     As applied to Miller, Minnesota Statutes section 211B.02 does not violate Miller's free-speech or associational rights under the U.S. and Minnesota Constitutions.**

Miller next argues that, as applied to him, Minnesota Statutes section 211B.02 is unconstitutional because it violates his free-speech and associational rights under the U.S. and Minnesota Constitutions. *See* U.S. Const. amend. I; Minn. Const. art I, § 3.

We begin with the level of scrutiny to apply. Miller argues for strict scrutiny. Quoting *State v. Holloway*, he asserts that application of the statute is constitutional only "if it advances a compelling state interest and is narrowly tailored to further that interest." 916 N.W.2d 338, 344 (Minn. 2018) (quotation omitted). Miller observes that the Minnesota Supreme Court has held that courts must employ the same constitutional standard to an as-applied challenge to a statute as to a facial challenge, *see, e.g.*, *Rew v. Bergstrom*, 845 N.W.2d 764, 778 (Minn. 2014), and points out that we applied strict scrutiny when we upheld section 211B.02 against a facial challenge in *Linert v. MacDonald*, 901 N.W.2d 664, 668 (Minn. App. 2017).

The Attorney General, on the other hand, asserts that we should apply the lower standard that the U.S. Supreme Court employed in evaluating the constitutionality of a state election law in *Burdick v. Takushi*, 504 U.S. 428 (1992). In *Burdick*, a voter challenged

10

Hawaii's prohibition on write-in voting, asserting that the law did not satisfy strict scrutiny. 504 U.S. at 432. While recognizing that the law imposed some burden on the right to vote, the Supreme Court rejected the argument that the law therefore was subject to strict scrutiny. *Id.* at 433-34. Rather, the Court explained, the rigorousness of the inquiry depends on the extent to which the law burdens voters' First or Fourteenth Amendment rights. *Id.* at 434. If a challenged regulation imposes "severe" restrictions on those rights, strict scrutiny applies. *Id.* (quotation omitted). But, if the regulation imposes only "reasonable, nondiscriminatory restrictions" upon voters' rights, the standard is whether "the State's important regulatory interests" justify the restrictions. *Id.* (quotation omitted). The *Burdick* Court concluded that the latter, less demanding standard applied to Hawaii's regulation. *Id.* at 438-39. Here, the Attorney General asserts that, like the regulation in *Burdick*, section 211B.02's prohibition on false statements of endorsement is a "reasonable, nondiscriminatory restriction" and that the lower constitutional standard therefore applies.

We question whether the lower standard used in *Burdick* applies here. In *McIntyre v. Ohio Elections Comm'n*, a case involving an Ohio statute that prohibited distributing anonymous pamphlets in an election, the U.S. Supreme Court declined to use the standard used in *Burdick* and instead applied strict scrutiny. 514 U.S. 334, 347 (1995). The Court explained that Ohio's prohibition on anonymous election pamphlets, unlike Hawaii's prohibition on write-in voting, did not "control the mechanics of the electoral process" but rather burdened "core political speech." *Id.* at 345, 347. Similarly, here, although section 211B.02 involves the regulation of elections, it is primarily a statute that regulates speech (albeit false speech), not the mechanics of an election. Moreover, we have already applied

11

strict scrutiny in evaluating the facial constitutionality of section 211B.02. *See Linert*, 901 N.W.2d 664. Nevertheless, we need not decide whether strict scrutiny or a less rigorous standard applies if the application of section 211B.02 satisfies strict scrutiny. We turn to that question.

*Freedom of Speech*

Miller asserts that application of the statute violates his constitutional right to free speech. Although statutes are generally presumed constitutional, a statute that restricts speech is not presumed to be constitutional, and the government must show that the statute is constitutional. *Id.* at 667. "Content-based restrictions on speech survive First Amendment strict-scrutiny analysis only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end." *Id.* at 668 (quotation omitted).

First, we evaluate whether application of section 211B.02 serves a compelling government interest. As we concluded when we upheld section 211B.02 against a facial challenge, "promoting informed voting and protecting the political process" is a compelling government interest and that interest is served by the statute's "prohibition against false claims of support or endorsement." *Id.*; *see also McIntyre*, 514 U.S. at 349 (stating that the state's interest in preventing fraud carries "special weight" during election campaigns); *Schmitt*, 275 N.W.2d at 591 (determining that the prohibition against false statements of support or endorsement serves the government interest in "protecting the political process").

Miller contends that that governmental interest is not served here because he is being penalized for "truthful, non-falsifiable speech." He characterizes the challenged statement

12

as expressing that he is a "republican" who has "Republican Party virtues but as a constitutional conservative." He contends that the statement, thus characterized, is true, and therefore properly informed the electorate, or is at least nonfalsifiable because it cannot be proved false. But, as OAH found, Miller's statement in the context of the rally flyer implied that he had the support or endorsement of the Republican Party of Minnesota—a statement that was false and could be proved false. His statement therefore did not accurately inform the voters, and the state has a compelling interest in prohibiting it.

Second, we evaluate whether section 211B.02, as applied to Miller, is narrowly tailored to achieve the government's interest. "A statute is narrowly tailored if it advances a compelling state interest in the 'least restrictive means among available, effective alternatives.'" *Linert*, 901 N.W.2d at 668 (quoting *Ashcroft v. Am. Civ. Liberties Union*, 542 U.S. 656, 666 (2004)). A statute is overbroad if it prohibits constitutionally protected activity in addition to the activity that is not constitutionally protected. *Id.*

Miller suggests that, as an alternative to applying the statute to him, voters could have accessed several websites, including the Minnesota Secretary of State's website and political parties' websites, in order to find out whether Miller had been endorsed by the Republican Party of Minnesota. Miller, however, does not show that this would be an effective alternative because he does not explain how the availability of other information would combat the harm of his false claim of support or endorsement. In *Linert*, we rejected the argument that counterspeech is an effective and less-restrictive means to achieve the compelling state interest served by section 211B.02's prohibition on false statements of support or endorsement. *Id.* at 669. We concluded that the candidate challenging the statute

had not demonstrated or persuaded us "that counterspeech—even media statements and retractions—is an effective alternative means to combat false claims of support or endorsement" and that "[t]his is particularly true with respect to false claims made in the final days leading up to an election." *Id.* at 670. Similarly, here, we reject the argument that other sources of information render application of the statute not "narrowly tailored."

As for overbreadth, Miller argues that application of the statute to him is overbroad because it penalizes a truthful or at least a nonfalsifiable statement. But, for the reasons explained above, Miller's implied statement of support or endorsement of the Republican Party of Minnesota was neither truthful nor nonfalsifiable. His argument that application of the statute is overbroad is unavailing.

*Freedom of Association*

Finally, Miller argues that section 211B.02 is unconstitutional as applied to him because it violates his right to free association. Miller contends that OAH's penalty violates his right to associate with the Caravan of Patriots and his right to associate with potential voters for the purpose of engaging in expressive activity regarding conservatism and political views.

As Miller asserts, the constitutional right to freedom of association includes the right to associate for the purpose of engaging in other activity protected by the First Amendment, including speech and assembly. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). But the statute's prohibition on false statements of support or endorsement did not restrict Miller's ability to associate with the Caravan of Patriots or to attend the event, nor did it limit his ability to associate with voters. And, even if any such restrictions were imposed, again, the

14

statute is constitutional as applied to Miller because it furthers the compelling government interest of promoting informed voting and is also narrowly tailored since it merely forbids falsely implying party support or endorsement.

**Affirmed.**